**AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, Kathryn Giuntoli, and Joan Markley, Plaintiffs-Appellees,**

v.

**CITY OF ST. CHARLES and Fred T.L. Norris, Defendants-Appellants.**

No. 86–1007.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1986.

Decided June 6, 1986.

Jack M. Siegel, Siegel & Warnock, Chicago, Ill., for defendants-appellants.

Fay Clayton, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiffs-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

For many years, the government of St. Charles, a city outside of Chicago, has between Thanksgiving day and New Year's day festooned a six-acre area of trees and public buildings with colored lights to celebrate Christmas. The display includes Christmas trees, wreaths, snowflakes, reindeer, Santa Claus, and other common Christmas symbols, but it also includes (and has for 15 years) a cross. On top of the fire department (a three-story building, clearly marked as the fire department) is a 35-foot-high television aerial. About three-fifths of the way up the aerial is an 18-foot metal cross-bar, which is no longer a functional part of the aerial. When lit up at night the aerial and cross-bar form the unmistakable symbol of Christianity. Although only a part of the municipal Christmas display, it is a prominent part. At 75 feet above street level it is one of the tallest structures in St. Charles, and there was evidence that it is several hundred feet away from any other structure of comparable height. One of the individual plaintiffs testified that the lighted cross "is an overpowering feature of the Christmas decorations that are in that area," and both testified that there is no taller object in the city's Christmas display.

Shortly before the cross was to be lit for the 1985 Christmas season, two residents of St. Charles, and an association to which they belong, sued the city and its mayor under 42 U.S.C. § 1983 to enjoin the lighting of the cross. One of the individual plaintiffs is a Methodist who is offended by what she regards as a display inconsistent with the separation of church and state; the other, though raised as a Christian, is a nonbeliever. Affidavits attached to the motion for preliminary injunction attest that the individual plaintiffs were so offended by the lighted cross that they departed from their accustomed routes of travel to avoid seeing it. They argue that the display of the lit cross (unlit it is just an aerial) is an establishment of religion forbidden by the First Amendment to the Constitution, which the Supreme Court has held to be applicable to the states by virtue of the Fourteenth Amendment. The district judge granted a preliminary injunction against lighting the cross, 622 F.Supp. 1542 (N.D.Ill.1985), and the town and its mayor (the defendants) appeal under 28 U.S.C. § 1292(a)(1).

The first question we consider is the plaintiffs' standing to maintain this suit; since the American Civil Liberties Union alleges no injury to itself, its standing depends on that of its members, the individual plaintiffs. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 476 n. 14, 102 S.Ct. 752, 761 n. 14, 70 L.Ed.2d 700 (1982). In most suits to enforce the establishment clause the plaintiff is a taxpayer complaining about the use of tax revenues to finance an activity that supports religion or a particular denomination or faith. See, e.g., *Grand Rapids School Dist. v. Ball*, — U.S. —, 105 S.Ct. 3216, 3221 n. 5, 87 L.Ed.2d 267 (1985). The complaint in this case alleges that the individual plaintiffs are taxpayers but not that any part of the expense of the cross is paid for out of tax revenues; hence the plaintiffs' status as taxpayers is irrelevant. As a matter of fact the lights are put up by the city's volunteer firemen, on their own time, and the minuscule cost of the electricity

---

* Hon. William J. Campbell, of the Northern District of Illinois, sitting by designation.

required to keep the lights lit is defrayed by voluntary contributions from city residents. (The record doesn't show who owns the lights.) Conceivably the city incurs some expense in maintaining the cross-bar, whose principal and perhaps only use at present is to complete the skeleton for the lighted cross; but this is not the basis on which the plaintiffs claim to have standing, and there is evidence that the cross-bar helps to brace the aerial. Nor do the plaintiffs suggest that if the aerial with cross-bar were not used as a lighted cross the city might lease it for commercial or other private display at Christmas and is therefore forgoing public revenues by not doing so.

■ The fact that the plaintiffs do not like a cross to be displayed on public property—even that they are deeply offended by such a display—does not confer standing, see *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., supra,* 454 U.S. at 485–87, 102 S.Ct. at 765–66; *Diamond v. Charles,* —— U.S. ——, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986); *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984); *Brashich v. Port Authority,* 484 F.Supp. 697, 701–03 (S.D.N.Y. 1979), aff'd without opinion, 628 F.2d 1344 (2d Cir.1980), for it is not by itself a fact that distinguishes them from anyone else in the United States who disapproves of such displays. To be made indignant by knowing that government is doing something of which one violently disapproves is not the kind of injury that can support a federal suit. *People Organized for Welfare & Employment Rights v. Thompson,* 727 F.2d 167, 171 (7th Cir.1984). Maybe it ought to make a difference if (as here) a plaintiff is complaining about the unlawful establishment of a religion by the city, town, or state in which he lives, rather than about such an establishment elsewhere; he might be intensely distressed to find himself living in a jurisdiction that had an established church. But there is no need to get into degrees of distress, because distress is not the only injury that the individual plaintiffs in this case claim to have

suffered. They say they have been led to alter their behavior—to detour, at some inconvenience to themselves, around the streets they ordinarily use. The curtailment of their use of public rights of way is similar to the alleged curtailment of the plaintiffs' use of the national parks in *United States v. SCRAP,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The cost in this case is no doubt slight, but it was even slighter in SCRAP; and the willingness of plaintiffs (or even just one plaintiff, as we shall see) to incur a tangible if small cost serves to validate, at least to some extent, the existence of genuine distress and indignation, and to distinguish the plaintiffs from other objectors to the alleged establishment of religion by St. Charles.

To the argument that the plaintiffs have inflicted this cost on themselves and can avoid it by continuing to follow their accustomed routes and shrugging off the presence of the lighted cross, the decision in *Abington School Dist. v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963), is a complete reply. The Court held that schoolchildren and their parents had standing to complain that the reading of the Bible and the recitation of the Lord's Prayer in the public school which the children attended violated the establishment clause. That the injury to the plaintiffs could have been averted by the parents' taking their children out of public school and putting them in a secular private school did not deprive the plaintiffs of standing. See also *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., supra,* 454 U.S. at 486 n. 22, 102 S.Ct. at 766 n. 22.

Behind the result in *Schempp* lies the practical recognition that if the injury, tenuous though it be, suffered by the involuntary audience for a display alleged to constitute an establishment of religion does not confer standing to sue, there will be no judicial remedy against establishments of religion that do not depend on public funds. Suppose the City of St. Charles conceived, proclaimed, organized—in a word, estab-

lished—the "Church of St. Charles" but appropriated no moneys for its support, counting instead on voluntary contributions to pay for the acquisition and upkeep of the city's religious edifices and the salaries of its ministers, and suppose that as a result of this establishment a resident of the city, deeply offended, moved away. If he lacked standing to attack the establishment, no one would have standing. This would not matter if the Supreme Court took the view that violations of the establishment clause are not justiciable in the absence of public expenditures (after all, not all violations of the Constitution are justiciable, see, e.g., *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937)), but quite obviously the Court does not take that view, and that is conclusive of the issue of standing in this case as it was in *Schempp.* A more elaborate discussion of the issue, reaching the same conclusion, is found in *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1102–09 (11th Cir.1983), a case with facts much like those of the present case. See also *Hawley v. City of Cleveland,* 773 F.2d 736 (6th Cir.1985); *Bell v. Little Axe Independent School Dist. No. 70,* 766 F.2d 1391, 1398–99 (10th Cir.1985).

■ At the preliminary injunction hearing only one of the two individual plaintiffs testified that she detours from her accustomed route to avoid the cross when it is lit. But one plaintiff is all that is needed to enable the suit to be maintained, and anyway the test for standing, as for jurisdiction generally, is the good-faith allegations of the complaint, rather than what the evidence shows. *South East Lake View Neighbors v. Department of Housing & Urban Development,* 685 F.2d 1027, 1034 (7th Cir.1982). If a plaintiff merely fails to *prove* injury, his failure goes to damages (or in an equity case like this, to the right to obtain an injunction), rather than to jurisdiction. Otherwise the consequence of a failure to prove actual or threatened injury would not be a judgment on the merits for the defendant but a dismissal on jurisdictional grounds that might allow the plaintiff to start the suit over again. See *Ross v. Inter-Ocean Ins. Co.,* 693 F.2d 659, 663 (7th Cir.1982).

■ So let us turn to the merits, where the first thing to note is that a judge asked to grant a preliminary injunction is put in the awkward position of having to make a judgment, with potentially serious consequences for the litigants and perhaps others as well, on an incomplete, because hastily compiled, record. If he erroneously grants the injunction he imposes an unjust harm on the defendant, but if he erroneously denies it he imposes an unjust harm on the plaintiff. Which is the worse error? This depends on who is more likely to win when the full trial on the merits is held and who is more likely to be hurt (and how much) by the decision on preliminary relief. If the plaintiff is likely to win, and (alone or with other persons) is likely to sustain greater injury if the injunction is denied than the defendant (along with any other persons aligned with him) is likely to sustain if it is granted, the case for the injunction is made. *American Hospital Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589, 598 (7th Cir.1986). We need consider no other possibilities, as this is the one that best describes this case. We emphasize, however, that the discussion that follows is based on the incomplete record of the preliminary injunction proceedings; the full trial on the merits may support a different conclusion. See *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981).

■ The original purpose of providing that Congress "shall make no law respecting an establishment of religion" was to prevent the national government from setting up an established church (like the Church of England), that is, a church financed and controlled by government and accorded privileges denied other religious groups. See *Terrett v. Taylor,* 13 U.S. (9 Cranch) 43, 49, 3 L.Ed. 650 (1815); McConnell, *Accommodation of Religion,* 1985 S.Ct.Rev. 1, 20–21; Smith, *Getting Off on the Wrong Foot and Back on Again: A*

*Reexamination of the History of the Framing of the Religion Clauses,* 20 Wake Forest L.Rev. 569, 575–634 (1984). The establishment clause was designed to secure the religious liberties of those people who did not belong to whatever denomination might have become the national church. Congress was not to take sides in the competition among religious groups.

The town council of St. Charles, Illinois, is not the Congress of the United States, and displaying a cross on a public building during the Christmas season is not the establishment of a denomination, or even of Christianity in general, in any literal sense. As noted before, the display cost the taxpayers of St. Charles nothing. But these considerations cannot be conclusive. Not only has the establishment clause for almost fifty years been held applicable to state and local government as well as to Congress and other federal organs (see, e.g., *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)); during this period it has been held to forbid acts of establishment remote from the contemplation of the framers of the clause and the framers of the Fourteenth Amendment.

When the Bill of Rights was adopted, several of the states still had established churches. See 1 Ahlstrom, A Religious History of the American People 460–61 (1975). By the time the Fourteenth Amendment was adopted in 1868, the state churches had been disestablished (Massachusetts' was the last to go, in 1833, see 1 *id.* at 461); yet the nation was more rather than less religious than it had been in the late eighteenth century, at least if one can judge by church membership. See Latourette, A History of Christianity 1230 (1953). Not only Abolitionism, but the Civil War itself, had both drawn on and stimulated religious emotions and expression. See 1 Ahlstrom, *supra,* at 35; 2 *id.* at 117–26; Van Alstyne, *Trends in the Supreme Court,* 1984 Duke L.J. 770, 786; Wilson, Patriotic Gore 90–106 (1962). One has only to think of the "Battle Hymn of the Republic," and of Lincoln's second inaugural address, with its pervasive religious imagery (as in: "Yet, if God will that [this mighty scourge of war] continue, until all the wealth piled by the bond-man's two hundred and fifty years of unrequited toil shall be sunk, and until every drop of blood drawn with the lash, shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said 'the judgments of the Lord, are true and righteous altogether' "). As late as 1892 the Supreme Court could state in the manner of a truism, "this is a Christian nation." *Church of the Holy Trinity v. United States,* 143 U.S. 457, 471, 12 S.Ct. 511, 516, 36 L.Ed. 226 (1892). And while there is no great difficulty in imagining that religious liberty is one of the liberties that the Fourteenth Amendment forbids states to deprive persons of without due process of law, there is some semantic as well as historical difficulty in equating a law aiding religion, or even a particular denomination, to a law depriving persons of their religious liberty. Howe, The Garden and the Wilderness 73 (1965).

The modern Supreme Court, however, has treated the establishment clause as a directive to the courts to strike down all public acts, federal, state, and local, whose primary purpose or predominant effect is to promote one religious group at the expense of others or even promote religion as a whole at the expense of the nonreligious—a position that in effect treats the nonreligious as a sect, the sect of nonbelievers. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The Court's approach is illustrated by *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), which held that a state statute requiring the posting of a copy of the Ten Commandments on the wall of every public school classroom in the state violated the establishment clause, even though the copies had been bought with private contributions.

Tested by the standard of these cases St. Charles must lose, at least on the record compiled so far (an essential qualifi-

cation that we shall now stop repeating). The plaintiffs testified—what is anyway obvious—that the Latin cross (a cross whose base stem is longer than the other three arms) is a symbol of Christianity. It is, indeed, the principal symbol of Christianity as practiced in this country today. When prominently displayed on a public building that is clearly marked as and known to be such, the cross dramatically conveys a message of governmental support for Christianity, whatever the intentions of those responsible for the display may be. Such a display is not only religious but also sectarian. This is not just because some religious Americans are not Christians. Some Protestant sects still do not display the cross (though few Protestants would say any longer, "The sign and image of the cross is now, as of old, in the forefront of the pagan assault upon the simplicity of the faith of God in Christ," Ward, History of the Cross iii (1871)). The Greek Orthodox church uses as its symbol the Greek (equilateral) cross, not the Latin cross. Even today the establishment clause is not so strictly interpreted as to forbid conventional nonsectarian public invocations of the deity, a standard example being the slogan on U.S. currency and coins: "In God We Trust." See *Lynch v. Donnelly*, 465 U.S. 668, 676, 104 S.Ct. 1355, 1360, 79 L.Ed.2d 604 (1984); 31 U.S.C. §§ 5112(d)(1), 5114(b); cf. *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). But the more sectarian the display, the closer it is to the original targets of the clause, so the more strictly is the clause applied. The display of the cross, at least in the circumstances revealed by the record of this case, is sectarian.

The city places almost the whole weight of its argument on *Lynch v. Donnelly*, *supra*, which allowed the town of Pawtucket, Rhode Island to include in its Christmas display a Nativity tableau (creche). The Nativity scene, with its figures of Mary, Joseph, the infant Jesus, the Magi, shepherds, angels, and animals, is an unequivocal Christian symbol, unlike the Christmas tree and the reindeer and the tinsel and the

Santa Claus; and the City of St. Charles argues that there is consequently no difference between including the Nativity scene in a Christmas display and including the cross. But there is a difference. Christmas is a national holiday, celebrated by nonobservant Christians and many non-Christians, as well as by believing Christians. It owes its status, in part anyway, to the fact that most Christmas symbology either is unrelated to Christianity or is no longer associated with it in popular understanding. There is nothing distinctively Christian about reindeer, Santa Claus, gift-giving, eggnog, tinsel, toys, retail sales, roast goose, or the music (as distinct from the words) of Christmas carols. Some symbols that are Christian—such as the holly wreath, which both symbolizes Christ's hegemony (wreaths and garlands being a traditional symbol of kingship and prowess) and recalls the crown of thorns that was placed on His head before He was crucified, to mock His supposed Kingship, see Matthew 27:29 ("And when they had platted a crown of thorns, they put it upon his head, and a reed in his right hand: and they bowed the knee before him, and mocked him, saying, Hail, King of the Jews!"); Auld, Christmas Traditions 104–05 (1932)—have lost their Christian connotations. They are regarded by most people, including most Christians, as purely decorative. Like the wreath, the Christmas tree has a buried religious connotation, through an association (unknown to most people) with the Tree of Life in the Garden of Eden. See Crippen, Christmas and Christmas Lore 153 (1923); II Encyclopaedia Britannica: Micropaedia 904 (15th ed. 1975). Another hidden linkage is the fact that evergreen trees are a traditional symbol of eternal life. *Id.* The five-pointed star of Bethlehem, while unmistakably a part of the story of the birth of Jesus Christ, is the same star used in the American flag, and in many other secular settings; it, too, has lost its religious connotations for most people.

But the Latin cross has not lost its Christian identity, though some other crosses

have. (The cross is of course an ancient and variform religious symbol. See Blake, The Cross (1888).) The Red Cross has lost the religious connotation it once had, as has the Iron Cross (a Maltese—eight-pointed—cross that is the principal German military decoration); but these are not shaped like the Latin cross. So, of course, has the swastika, to us the symbol of anti-Christian Nazism but to early Christains a veiled symbol of the cross. See III Encyclopaedia Britannica, *supra*, at 256. The crosses burned by the Ku Klux Klan are Latin crosses; and the burning cross, symbol of bigotry that it is, continues to remind of the Christian symbol that the Klan has appropriated to its sinister purposes. The St. Charles cross unmistakably signifies Christianity, as the reindeer and Santa Claus, and even the star and the wreath, do not.

The Nativity scene is a mixed case. A vivid tableau of the birth of Jesus Christ, it brings Christianity back into Christmas, unlike the star and the wreath and the tree, which for most people are in the nature of lifeless metaphors—like "caesarian section," an expression used by most people without thinking of Julius Caesar, or, coming closer to the subject of this opinion, "inferno," used without thinking of the infernal region, i.e., Hell, or *"Santa* Claus," or "City of St. Charles" itself, or "Santa Cruz," California ("Holy Cross"). The Nativity scene is an unmistakable reminder of the holiday's religious origins. Yet it does not follow that its inclusion in a Christmas display lacks secular purpose, or that its predominant effect is to promote Christianity. See *Lynch v. Donnelly, supra,* 465 U.S. at 680–82. As Justice O'Connor explained in her concurring opinion in *Lynch,* once it is conceded that the government can celebrate Christmas as a public holiday, despite its religious origins and continued religious significance to believing Christians, the inclusion of the Nativity scene in the celebration is seen to serve a secular purpose—"celebration of a public holiday with traditional symbols," *id.* 465 U.S. at 693, 104 S.Ct. at 1369—and therefore "cannot fairly be understood to convey a message of government endorsement of religion." *Id.* One may question whether the second proposition follows from the first; the purpose could be secular, but the dominant effect to promote Christianity. Yet maybe not, where as in the *Lynch* case the Nativity scene is mixed in with the other traditional symbols of Christmas, most of which either never had or have lost their Christian connotations.

█ Even if the inclusion of the Nativity scene has some effect in promoting Christianity (which, realistically speaking, it does), the Supreme Court may have felt that the effect was not great enough to warrant the mutilation of traditional Christmas displays in order to remove every trace of religion from Christmas. The "wall of separation" is not so impermeable as to require that the manger be shown empty, or the Magi and the shepherds be shown standing rather than kneeling, or Mary shown without a child, or "Nativity" be spelled with a small "n" or the angels purged from the scene. Our culture has taken much of the Christian flavor out of Christmas. Christianity took the idea of a holiday coinciding with the winter solstice (along with much symbology) from the pagans (Romans, Persians, Celts, others, see, e.g., Auld, *supra*, ch. 1; Crippen, *supra*, at 8); and some would say that the pagans have had their revenge. But the establishment clause does not require that the remaining traces of Christianity be banished from public celebrations of Christmas. The spirit of Scrooge does not inform the establishment clause.

The district judge found, however—we cannot say clearly erroneously—that the cross is not a traditional Christmas symbol. None of the books we have been able to find on the history of Christmas lists "cross" as an index entry. See Auld, *supra;* Crippen, *supra;* Dawson, Christmas (1902); Miles, Christmas in Ritual and Tradition (1912); Wernecke, Christmas Customs Around the World (1959). The reason is easy to see. The cross was a device for inflicting a slow and painful death on traitors, pirates, and other serious miscreants.

The device that the Romans used to execute Christ, it became the symbol of death, resurrection, and salvation, not of birth—of Easter not of Christmas. See 4 Encyclopaedia of Religion and Ethics 328 (1912). It is "the principal symbol of the Christian religion, recalling the crucifixion of Jesus Christ and the redeeming benefits of his passion and death." III Encyclopaedia Britannica, *supra*, at 256. Of course without the birth of Jesus there would have been no resurrection and salvation; and hence the joy of Christmas to believing Christians is inseparable from the salvation of man, symbolized by the cross. Christmas and the crucifixion are also linked indirectly by the legend that the cross on which Jesus was crucified was made out of the Tree of Life, from which the Christmas tree derives as we have seen. See Crippen, *supra*, at 153. But this is a linkage of which not one American in 10,000, we would guess, is aware.

When Christmas is considered in its secular signification, as a public holiday for Americans of whatever system of religious belief (or nonbelief), the introduction of the cross into the Christmas celebration strikes a discordant chord; for most Americans do not like to think about death in connection with birth. At any rate the cross is not in fact a common Christmas symbol, as far as any member of this panel is aware or the record shows. Its absence from Christmas celebrations may indeed be one of the reasons why Christmas is a national holiday celebrated by most Americans regardless of their religious affiliation. Whether or not you believe in the divinity of Jesus Christ, you cannot fail to be moved by the story of his birth in a manger as told in the New Testament and recalled by Christmas music, pageants, and displays, such as the Nativity tableau; in the words of Auld, *supra*, at 9, writing with great reverence, "Essentially, Christmas is the festival of childhood." But the story of the death and resurrection of Christ, the story that the cross calls to mind, moves only Christians deeply. For others it is the symbol of a system of belief to which they do not subscribe. The Mayor of St. Charles testified

that a Lutheran pastor had suggested that the lighted cross be changed to a lighted star because the star was "not identified so strongly as a Christian emblem."

St. Charles concedes that if it lit the cross on the roof of the fire house year round, it would be violating the establishment clause; and if as the district judge found the cross is not a traditional Christmas symbol—if it is the symbol not of Christmas but of Christianity—then it cannot gain the shelter of the lawful Christmas displays that adjoin it. The evidence indicates that the cross occupies a highly prominent place in the display, that it is integrated with the other components of the display only in the sense that it is one more lighted structure, and that it is understood to signify public support for Christianity rather than celebration of the Christmas season. The amount of support may not be great but it is greater than in *Lynch*; and precisely because the cross is not a traditional symbol of Christmas the injunction issued by the district judge does not require the mutilation of traditional Christmas symbology, as an injunction against a Nativity scene would.

The district court's assessment of the likelihood of the plaintiffs' prevailing when the case is tried in full is supported by a number of cases in which displays of the cross by public bodies have been held to violate the establishment clause. See *Friedman v. Board of County Commissioners*, 781 F.2d 777 (10th Cir.1985); *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.*, *supra*, 698 F.2d at 1110–11; *Gilfillan v. City of Philadelphia*, 637 F.2d 924, 928 (3d Cir. 1980); *Libin v. Town of Greenwich*, 625 F.Supp. 393, 397–400 (D.Conn.1985); *Greater Houston Chapter of American Civil Liberties Union v. Eckels*, 589 F.Supp. 222, 234–35 (S.D.Tex.1984); cf. *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978) (establishment clause of state constitution). There are factual differences between these cases (except *Fox*, which was decided however under the more strictly worded

establishment clause of the California constitution, and *Libin* ) and ours, but not ones that help the City of St. Charles. In *Friedman,* for example, the cross appeared on the city's seal, and since the county in which the city was situated had been founded by Franciscan priests the display had a historical as well as religious significance; the only significance of the St. Charles cross, at least so far as the present record discloses, is religious.

Several state cases have allowed displays of the cross, but in circumstances significantly different from those of the present case. *Eugene Sand & Gravel, Inc. v. City of Eugene,* 276 Ore. 1007, 558 P.2d 338 (1976), allowed the display of a cross as a war memorial, finding that the cross is a traditional memorial and grave marker for men who have fallen in action. The cross in *Meyer v. Oklahoma City,* 496 P.2d 789 (Okla.1972) (a case decided, by the way, under the Oklahoma constitution, which contains a more narrowly worded prohibition of establishment than the federal constitution), was in the midst of a fair grounds, and the court said that the "commercial setting in which the cross now stands and the commercial atmosphere that obscures whatever suggestions may emanate from its silent form, stultify its symbolism and vitiate any use, benefit or support for any sect, church, denomination, system of religion or sectarian institution as such." *Id.* at 792–93. No similar finding is compelled by the record of the present case. In *Paul v. Dade County,* 202 So.2d 833, 835 (Fla.Dist.Ct.App.1967), the record did "not indicate that this temporary string of lights forming a cross was used to support, aid, maintain or establish any religion or religious edifices." The plaintiffs in the present case corrected that evidentiary omission.

And since the plaintiffs showed they are likely to succeed on the merits when a full trial is held, they were entitled to the preliminary injunction unless the irreparable harm to the defendants from the injunction is so much greater than the irreparable harm would be to the plaintiffs if the injunction were denied that it would be on balance a worse error to grant the injunction than to deny it even though the plaintiffs have (at least at this juncture) a stronger case on the merits. The plaintiffs rely heavily on the statement in *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion), that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." The statement was made, however, in the context of free speech, and seems based not only on the high value that the courts assign to the right of free speech but also on the more mundane consideration that speech delayed may be speech destroyed; political speech (such as involved in *Elrod* ) often is addressed to transitory issues, and becomes stale when the issues pass away. See *id.* at 374 n. 29, 96 S.Ct. at 2690 n. 29. Religious freedom is as precious as free speech, but the plaintiffs do not argue that the St. Charles cross infringes their religious freedom. They are offended by the cross, but since indignation is not an injury that can confer standing to sue, it is not clear that it can be an element of the threatened harm on which a request for a preliminary injunction is based. And if it cannot be, then it may seem that all that the plaintiffs can complain of—and only one of them, at that—is the inconvenience of having to drive a couple of blocks out of her way in order to avoid the sight of the cross when it is lit up.

But something must be missing in this analysis, for it implies—what no one believes—that cases brought under the establishment clause are inconsequential (even when there is taxpayer standing, the amounts of money involved are often trivial: $20 a year in the *Lynch* case, for example). In order to keep down the amount of litigation and to steer the control of litigation to the persons most immediately affected—so that a suit to enjoin the St. Charles cross is brought by residents of St. Charles who have incurred some though maybe only slight inconvenience, rather than by residents of Pasadena

who read about the St. Charles cross in the *Los Angeles Times* (cf. *Allen v. Wright, supra,* 104 S.Ct. at 3327)—the rules of standing confine the right to sue to persons who can show something akin to a common law injury, that is, an injury to person or property. See *People Organized for Welfare & Employment Rights v. Thompson, supra,* 727 F.2d at 171, and cases cited there. The injury here is to the free use of the city's streets and sidewalks. The limitation as to who may sue is due not to some idea that the injury inflicted by violations of the establishment clause is inconsequential but to the fact that it is such a diffuse injury that a choice among potential plaintiffs is necessary. The doctrine of standing is the mechanism of choice. But the diffuse injury is not thereby made irrelevant. It affects the public interest, a traditional element in the determination whether to grant a preliminary injunction. See, e.g., *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 382–83, 388 (7th Cir.1984). If preliminary injunctions were not available in cases brought to enforce the establishment clause, government might be able to erode the values that the clause protects with a flood of temporary or intermittent infringements.

■ We conclude that in considering whether the plaintiff in a case under the establishment clause has shown irreparable harm, and how much, the court is not confined to the particular harm on which the plaintiff's standing to sue is based; it can consider the effect of the defendant's conduct on the interests protected by the clause if the injunction is not granted. Although the district court did not assess that larger impact here, there clearly is some, and therefore the inconvenience that one of the individual plaintiffs will suffer if the cross is lit next Christmas (for no one can be certain that the full trial on the merits will be completed by then—no trial date has been set and the parties have told us that they may want to conduct pretrial discovery) understates the amount of harm to society if the preliminary injunction is denied. The harm is irreparable as well as substantial because an erosion of religious liberties cannot be deterred by awarding damages to the victims of such erosion; most of those victims do not even have standing to sue. The trivial inconvenience suffered by one of the plaintiffs is only a small fraction of the potential harm inflicted by the defendants' alleged violation of the establishment clause.

■ As for irreparable harm to the defendants, this may well be zero. Their main argument on the merits is that the St. Charles cross is just another Christmas symbol. If so it can be replaced, with no loss of value—entertainment value, tourist-attracting value—by a star or a reindeer or a Santa Claus. The truth of course is that the principal harm from the injunction is to those Christian residents of St. Charles who want to see the prime symbol of Christianity prominently displayed. This might not seem the kind of harm that should be taken into account in deciding whether to enjoin a government act that promotes religion. The First Amendment does not allow an establishment of religion merely because it is a popular establishment (so popular, perhaps, that it is possible to support it by voluntary contributions, without the government's having to use the coercive power of taxation). And though the case would be different if the people of St. Charles could show that the practice of their religion required that the city maintain a lighted cross, no one has tried to show this. It may seem therefore that the cross is either a secular decoration, in which event there are many equally or more decorative substitutes at hand, or an attempt to establish Christianity as the officially recognized religion of St. Charles, and that whichever it is the defendants have not shown that enjoining it will cause irreparable harm. But this takes too simple a view. It may·be that the cross has a secular purpose and predominantly secular rather than religious effect but that the Christian residents of St. Charles (who are the vast majority, we may assume) derive pleasure from the display of this religious symbol. It would be a lawful pleasure, and would thus be entitled to weight in deciding

whether to grant a preliminary injunction that will have the effect of eliminating the symbol until the trial on the merits is over and a final judgment entered.

But this point has no bite in the present case. The record shows that the owner of a private building near the firehouse is ready, willing, and able to display a similar cross on his building. This substitution will give the Christian residents of St. Charles all the lawful satisfaction they derive from the cross on the firehouse. The only thing they will not get is the additional, but unlawful, satisfaction of knowing that the city government is using public property to promote Christianity.

There is thus no basis on which we can disturb the preliminary injunction, and the district judge's order granting it is therefore

AFFIRMED.