**LUBAVITCH CHABAD HOUSE, INCORPORATED, a not-for-profit corporation, chartered pursuant to the laws of the State of Illinois, Plaintiff–Appellant,**

v.

**CITY OF CHICAGO, an Illinois municipal corporation and Richard M. Daley, individually and as Mayor of the City of Chicago, Defendants–Appellees.**

No. 90–1188.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1990.

Decided Nov. 6, 1990.

Gary Sternberg, Sternberg & Associates, Y. Judd Azulay, Azulay & Azulay, Chicago, Ill., for plaintiff-appellant.

Ruth M. Moscovitch, Asst. Corp. Counsel, Office of Corp. Counsel, Appeals Div., L. Anita Richardson, Corp. Counsel, Jean Dobrer and Kelly R. Welsh, Asst. Corp. Counsel, Terence J. Moran, Eileen Brewer, Office of Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

The district court dismissed Lubavitch Chabad House, Inc.'s [1] (Lubavitch) cause of action seeking to require the City of Chicago to allow Lubavitch to display a free-standing Chanukah menorah structure at O'Hare International Airport (O'Hare) in a public area at Christmas time. Lubavitch appeals. We affirm the order of the district court.

## I. FACTS

Every Christmas season the City of Chicago decorates O'Hare facilities with Christmas trees and other traditional Christmas decorations, but the City intentionally excludes religious symbols from unleased public areas. On the other hand, private lessees may display religious symbols in their own Christmas exhibits in their leased areas, but City regulations prohibit structures from being erected in public areas, since the City has determined that displays in these areas might impede pedestrian traffic. The City provides for a broad variety of alternative methods of communicating messages, including a non-denominational chapel that is available to

---

1. Lubavitch "is an organization of Hasidic Jews who follow the teachings of a particular Jewish leader, the Lubavitch Rebbe. The Lubavitch movement is a branch of Hasidism, which itself is a branch of orthodox Judaism." *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, —— U.S. ——, 109 S.Ct. 3086, 3097 n. 35, 106 L.Ed.2d 472 (1989).

religious as well as non-religious groups. In addition, anyone can distribute leaflets or carry hand-held symbols (such as Chanukah menorahs) or signs in designated public areas within the confines of the airport area where such activities do not interfere with the free movement of pedestrian traffic.

In 1987 Lubavitch attempted to persuade the City of Chicago to allow it to display a free-standing Chanukah menorah[2] in one of the public areas of O'Hare during the Christmas season. Upon the City's refusal to allow the Chanukah display, Lubavitch initiated this litigation to enjoin the City from enforcing its regulations. Lubavitch contends that the City of Chicago's refusal to allow the display of a free-standing Chanukah menorah in a public area of O'Hare while the City has a Christmas display constitutes religious discrimination and a violation of the Equal Protection Clause of the U.S. Constitution Fourteenth Amendment. Lubavitch argues that the Christmas trees in the City's display represent Christianity. In addition, Lubavitch asserts that the City's regulations are unconstitutionally overbroad in that they fail to distinguish between high-traffic areas that require unimpeded access and low-traffic areas where the governmental interest in controlling structures is less compelling.

## II. CHRISTMAS TREES AS SECULAR SYMBOLS

Lubavitch in asserting that a Christmas tree standing alone represents Christianity or the religious aspect of Christmas is attempting to expand the Supreme Court's determination that a Christmas tree is a secular symbol rather than a religious symbol. Lubavitch's argument borders on the frivolous in view of current case law. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, — U.S. —, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *American Civil Liberties Union v. City of St. Charles*, 794 F.2d 265, 271 (7th Cir.1986),

cert. denied, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Lubavitch of Iowa, Inc. v. Walters*, 684 F.Supp. 610, 615 (S.D. Iowa 1988), aff'd, 873 F.2d 1161 (8th Cir. 1989). In *Allegheny*, five justices specifically addressed the secular nature of Christmas trees and found them to be secular symbols, and we believe that the majority of the other four justices would agree. Justice Blackmun stated unequivocally that "[t]he Christmas tree ... is not itself a religious symbol." *Allegheny*, 109 S.Ct. at 3113. Justice O'Connor agreed "that the Christmas tree, whatever its origins, is not regarded today as a religious symbol." *Id.* at 3122. The retired Justice Brennan, joined by Justices Marshall and Stevens, was certain that "the tree may, without controversy, be deemed a secular symbol if found alone" even though he believed the presence of a Chanukah menorah caused the tree to take on religious significance. *Id.* at 3125. Justice Kennedy, joined by Chief Justice Rehnquist, Justice White and Justice Scalia, made no mention of the nature of a Christmas tree; but given these four Justices' opposition to excluding a crèche standing alone from a public courthouse (*Id.* at 3134), it is unlikely that they would attach religious significance of constitutional magnitude to a Christmas tree. In view of this Supreme Court precedent, Lubavitch's argument that Christmas trees standing alone are Christian symbols wallows in a quagmire of quicksand. Furthermore, this Court's position on Lubavitch's argument should have been reasonably clear from our decision in *American Civil Liberties Union v. City of St. Charles* where we noted that a crèche

> "is an unequivocal Christian symbol, *unlike the Christmas tree* and the reindeer and the tinsel and Santa Claus.... Christmas is a national holiday, celebrated by nonobservant Christians and many non-Christians, as well as by believing Christians. It owes its status, in part anyway, to the fact that most Christmas symbology either is unrelated to Chris-

2. A menorah is a candelabrum with eight candles used to commemorate the Jewish holiday of Chanukah, an eight-day celebration that falls

near Christmas. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 109 S.Ct. at 3095 (1989).

tianity or is no longer associated with it in popular understanding.... Some symbols that are Christian ... have lost their Christian connotations. They are regarded by most people, including most Christians, as purely decorative."

*City of St. Charles*, 794 F.2d at 271 (emphasis added). This language hardly leaves much room for a good faith argument that a Christmas tree has religious meaning.

Indeed, Lubavitch's argument regarding the religious significance of Christmas trees has on previous occasions been specifically rejected on the basis of the Supreme Court's inclusion of Christmas trees in a list of other secular symbols in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), and on the basis of our holding in *City of St. Charles*. In *Lubavitch of Iowa, Inc. v. Walters*, the district court noted both cases and then held "[i]n view of this authority, I must conclude that the state's display of Christmas trees does not constitutionally require that the state permit display of the menorah." 684 F.Supp. at 615. On appeal, the Eighth Circuit did not specifically address the nature of Christmas trees, but it stated that "[w]e find Lubavitch's claim borders on the frivolous." 873 F.2d at 1163. We agree.[3]

The current jurisprudence regarding the secular nature of Christmas trees is further buttressed by the historical origins of Christmas trees. Most authorities on the subject agree that the use of greenery in general and Christmas trees in particular are derived from ancient pagan customs:

"The use of evergreen trees, wreaths, and garlands as a symbol of eternal life was an ancient custom of the Egyptians, Chinese, and Hebrews. *Tree worship, common among the pagan Europeans, survived after their conversion to Christianity* in the Scandinavian customs of decorating the house and barn with evergreens at the New Year to scare away the devil and of setting up a tree for the birds during Christmas-time; it survived further in the custom, also observed in Germany, of placing a Yule tree at an entrance or inside the house in the mid-winter holidays."

*The New Encyclopedia Britannica*, Volume 3 at 284 (15th ed. 1990) (emphasis added). Thus, it seems that the initial use of evergreen trees at Christmas time were used to worship nature (pantheism) rather than paying respect to a Christian God. Other authors have also noted the pantheistic source of Christmas trees:

"the presence of the ... evergreens ... is one of the ... contributions which paganism made to [Christmas]. The ... custom has its roots in the profound reverence of the ancients for all natural phenomena. To their simple and unartificial minds Nature was everywhere alive. Every fountain had its spirit, every mountain its deity and every water, grove and meadow its supernatural associations."

W. Auld, *Christmas Traditions* 99 (1931).[4] These pagan associations of the Christmas tree has caused it to be rejected often by Christians. Alfred C. Hottes observed that the pagan roots of decorating with greenery made such decorations controversial in the church.

"The use of evergreens was so closely associated with the garlands of pagan days that in many of the early church celebrations they were forbidden. For instance, Bishop Martin of Barcae, in 575 forbade the use of all greenery and 'other dangerous Calend customs.' It was therefore not until the sixteenth century

---

**3.** We note that in its briefs on file with the Court Lubavitch fails to even acknowledge our *American Civil Liberties Union v. City of St. Charles* decision or the holding of the district court in *Lubavitch of Iowa, Inc. v. Walters*, which was affirmed by the Eighth Circuit.

**4.** Although Auld recognizes that "anthropologists are no doubt correct in seeing in [the Christmas tree] a survival in some sense of primitive tree worship" and that the use of the Christmas tree was "the ultimate result of the union of two elements," he nonetheless concluded that "[t]he Christmas tree, however, as we have it, is almost entirely the creation of Christian thought and sentiment." *Christmas Traditions* at 136–37. This conclusion is inconsistent with his other findings.

that Christian houses were commonly decorated."

A. Hottes, *One Thousand and One Christmas Facts and Fancies*, 71–72 (1959). Noted religious historian E.O. James concluded that the celebration of the Christmas season at the time of the winter solstice, which was the focus of a great variety of pagan rites, resulted in a syncretization of pagan and Christian customs.

> "Thus, around the Christmas Festival, a great variety of ancient seasonal customs and beliefs from a number of different sources clustered, originally observed from the beginning of November to the end of January, particularly those connected with the winter solstice rites on December 25 and the Kalends of January, the Roman New Years Day, characterized by rejoicings, the decoration of houses with greenery and lights, carousals, well-laden tables and fire rites. With them were combined Dionysian elements from the festival of Dionysus on January 5, and perhaps from Osirian sources associated with the birthday of Osiris in Alexandria...."

E.O. James, *Seasonal Feasts and Festivals* 231–32 (1961).

From the foregoing discussion it is clear that the use of Christmas trees and other greenery during what has become one of our holiday seasons [5] did not originate with Christianity. Indeed, the first record of the use of an evergreen as a Christmas tree is in an anonymous manuscript of 1605 from Strassburg. From there the custom spread slowly and apparently came to America with German settlers in Pennsylvania. C. Hole, *Christmas and Its Customs* 18 (195–). Furthermore, the public erection of Christmas trees is of even more recent origin. The first communal Christ-

mas tree was erected by the citizens of Pasadena, California, in 1909 on Mount Wilson, and in 1912 a Christmas tree was erected in Madison Square Park, New York. *See Id.* at 20. Thus, the tradition of erecting Christmas trees in public places, which Lubavitch would like to have us characterize as distinctively Christian, is less than a century old whereas Christianity has been around for nearly two thousand years. Lubavitch's position is further undermined by the overwhelming use of Christmas trees by the majority of Americans of religious as well as non-religious persuasion alike. Hence, Lubavitch's assertion that the Christmas tree "tends to bring to mind, draws attention to and enhances the celebration of [Jesus Christ] ..." is without foundation.

Because we hold that Christmas trees standing alone or among other secular symbols of Christmas are without religious connotation, Chicago's inclusion of Christmas trees with its decorations at O'Hare during the Christmas season while refusing to allow Lubavitch to erect free-standing Chanukah menorahs fails to constitute religious discrimination or an equal protection violation. We believe that under *Allegheny*, the City has the option of allowing the erection of Chanukah menorahs or other religious symbols along with the secular displays, or even including them in its own displays, but on the other hand, we see no reason to mandate that *Allegheny* provides a basis for Lubavitch's assertion that Chicago *must* allow it to erect free-standing Chanukah menorahs in the public areas of O'Hare along with the City's Christmas decorations.[6] Lubavitch's claim cannot prevail, for it has failed to establish that the display of Christmas trees at O'Hare is religious expression or that Chicago has

---

5. Formerly people wished each other "Merry Christmas" or "Happy New Year." Now we are more apt to hear "Happy Holidays" because the celebration of the Christmas season has become so commercialized and secularized as opposed to the original focus on paying respect to, and commemorating the birth of, the Christ child.

6. Lubavitch ignores the plain meaning of the *Allegheny* language it cites in its brief. The language from Justice Blackmun's opinion states that "it would be a form of discrimination

against Jews to allow Pittsburgh to celebrate Christmas as a cultural tradition while simultaneously *disallowing* the City's acknowledgment of Chanukah as a contemporaneous cultural tradition." 109 S.Ct. at 3112 (emphasis added). Justice Blackmun was referring to preventing the City from celebrating Chanukah; the comment does not address the idea of allowing a private party to force the City to celebrate Chanukah.

violated the Equal Protection Clause by refusing to allow Lubavitch's free-standing Chanukah menorah.

## III. CITY REGULATIONS PROPERLY TAILORED

 The government may permissibly place reasonable restrictions on the time, place or manner of speech as long as any regulations are content neutral, narrowly tailored to promote a significant governmental interest, and the regulations leave open adequate alternative modes of communication. *Ward v. Rock Against Racism*, —— U.S. ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). Lubavitch challenges the City's regulation that prohibits anyone but the City or its lessees from placing structures at O'Hare on the basis that it is overbroad;[7] that is, Lubavitch is alleging that the regulation does not fit within the parameters of an ordinance narrowly tailored to promote a significant governmental interest. The challenged regulation provides that

> "In conducting the activities described herein under Part One [activities protected under the First Amendment], no individual or group shall:
>
> *　　*　　*　　*　　*　　*
>
> D. Erect any table, chair or other structure other than in a leased space, and/or use any wheeled or stationary device, since such objects may tend to create a dangerous obstruction to other persons using the Airports and substantially interfere with rapid and efficient Airport operations...."

7. Lubavitch is apparently attacking the City regulation "as-applied" rather than "facially" although it uses the "overbroad" language of a facial attack. Justice Scalia recently clarified the difference between the two methods of challenge in *Board of Trustees of State University of New York v. Fox*, —— U.S. ——, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989):

> "it is ... important to be clear about the difference between an as-applied and an overbreadth challenge.... The overbreadth doctrine differs from [as-applied] principally in this: The person invoking the ... narrow-tailoring rule asserts that *the acts of his that are the subject of the litigation* fall outside what a properly drawn prohibition could cover ...

The language of the regulation itself articulates the significant governmental interest involved—the interest in prohibiting obstructions to the use of the airport or interference with airport operations. Lubavitch contends, however, that the regulation is overbroad, as there are areas at O'Hare such as corners or other space outside the normal traffic flow that could accommodate structures such as a Chanukah menorah without interfering with pedestrian traffic or airport operations.

Lubavitch's argument apparently contests the reasonableness of the City's regulation, but the argument is fatally flawed in that it completely ignores the clear and unambiguous interpretation the Supreme Court has given to the term "narrowly tailored." Rather than acknowledging Supreme Court precedent, Lubavitch ingeniously implies that a "narrowly tailored" regulation must be limited to the least restrictive means.[8] That interpretation was laid to rest last year in *Ward v. Rock Against Racism:*

> "Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that *it need not be the least-restrictive or least-intrusive means of doing so.* Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation *promotes a substantial government interest that would be achieved less effectively absent the regulation.'* To be sure, this standard does not mean that a time, place, or manner regulation

> whereas the person invoking overbreadth 'may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him'...."

(Citation omitted) (emphasis original). Lubavitch asserts that the prohibition of structures in corners and low-traffic areas "fall outside what a properly drawn prohibition could cover," thus it is an "as-applied" challenge.

8. We note that in one of a number of its briefs on file with this Court Lubavitch failed to acknowledge any District, Appellate or Supreme Court cases or any other authority interpreting the concept of "narrowly tailored."

may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.... So long as the means chosen are *not substantially broader than necessary to achieve the government's interest,* however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward,* 109 S.Ct. at 2757–58 (footnote and citations omitted) (emphasis added). In view of this clear statement that a regulation "need not be the least-restrictive or least-intrusive means" of serving the government's legitimate interests, Lubavitch is unable to make a logical, much less convincing, argument that the City must tailor its regulation to prohibit structures only where they would interfere with the function of the airport. Here Chicago's decision to limit structures to those placed by the City in public areas or by lessees in leased spaces is reasonable for a number of reasons: Space at O'Hare is limited (Lubavitch conceded in its brief and at oral argument that there is not enough space to accommodate the structures of all who might wish to erect displays at O'Hare); the necessity of smooth and safe traffic flow requires supervision of the placement of all structures; the ban on structures enhances the City's ability to move travelers through O'Hare efficiently or to evacuate the premises in the event of a fire, explosion or airplane crash into the terminal; anyone who wishes to do so may lease available spaces (the regulations are content neutral); and the City provides adequate alternative methods of communication through its non-denominational chapel as well as through allowing the distribution of handbills, the holding of symbols such as Chanukah menorahs in one's hand and other modes of speech in the public areas. While the regulation might conceivably be more narrowly drawn, as Lubavitch suggests, the regulation as it exists "promotes a substantial government interest that would be achieved less effectively absent the regulation," and it is "not substantially broader than necessary to achieve the government's interest." Thus, Regulation D is properly tailored to meet a significant governmental interest.

More devastating to Lubavitch's argument is the fact that Regulation D infringes on no constitutionally protected rights. Lubavitch does not assert that anyone other than the City (who owns O'Hare) or its lessees (who pay for the privilege) erect structures at O'Hare. Rather, it argues that the display of Chanukah menorahs is a form of expression constitutionally protected and that the regulations inhibit the exercise of that right. Lubavitch misconstrues the nature of its right, however. We are not cognizant of, nor has the appellant appraised us of, any private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures. Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will. First Amendment jurisprudence certainly does mandate that if the government opens a public forum to allow some groups to erect communicative structures, it cannot deny equal access to others because of religious considerations, *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), but the record is clear that the City has prohibited all groups from erecting structures in the airport public areas. Based upon the reasoning set forth above, we are of the opinion that Lubavitch has no constitutional right at issue, since it is free to exercise the right to display religious symbols at O'Hare in the same manner as anyone else—by leasing space or by carrying hand-held symbols or signs.

## IV. CONCLUSION

Lubavitch's claims cannot prevail because Lubavitch fails to demonstrate, nor have we been able to ascertain, any consti-

tutionally protected rights at issue. The City's prohibition of Lubavitch's free-standing Chanukah menorah structure is reasonable and does not constitute religious discrimination, as the City of Chicago enforces the same prohibition for all free-standing religious symbols and there are no free-standing religious symbols of any sort displayed in the public areas of O'Hare during the Christmas season. The City's regulation prohibiting structures in public areas is valid as a reasonable time, place or manner restriction because it is content neutral; furthermore, it is narrowly tailored to serve a significant governmental interest, as the City provides for adequate alternative modes of communication. The order of the district court is

AFFIRMED.