**Richard GRAFF, Plaintiff–Appellant,**

v.

**CITY OF CHICAGO, Defendant–Appellee.**

**No. 92–2352.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 1, 1992.

Decided Feb. 16, 1993.

Order Granting Rehearing En Banc
and Vacating Opinion April 15, 1993.

---

Matthew J. Piers, Jonathan A. Rothstein (argued), Gessler, Flynn, Fleischmann, Hughes & Socol, Chicago, IL, for plaintiff-appellant.

Eileen T. Pahl, Ruth M. Moscovitch, ACC, Bobbie McGee Gregg, Asst. U.S. Atty. (argued), Kelly R. Welsh, Asst. Corp. Counsel, Benna R. Solomon, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for defendant-appellee.

Before CUMMINGS and MANION, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Richard Graff is in the business of selling newspapers and magazines adjacent to the Randolph Street entrance to the City of Chicago Cultural Center, formerly the flagship building of the Chicago Public Library. It is a prized location; a newsstand has operated on approximately the same site for seventy years. After Mr. Graff bought the stand in 1984 for $53,000, he applied several times for a permit. The city denied his application in each instance because, it said, the municipal policy toward newsstands was under review and the city was issuing no new permits, even to those with existing newsstands. Apparently Chicago allowed permitless stands to operate during this period. In 1987 Mr. Graff moved his stand from the east to the west side of the steps of the Randolph Street entrance to make way for construction crews. He did so at the behest of the city, though the parties dispute whether Mr. Graff was forced to move or he agreed to do so. Subsequently, the city sent Mr. Graff a series of notices ordering him to remove the structure entirely. Each of these notices was rescinded after consultations between Mr. Graff's lawyers and municipal officials. When Mr. Graff applied once again for a permit, he was told that the city was still not issuing them, though Mr. Graff claimed to have evidence to the contrary. Concerned that he would be driven

out of business, Mr. Graff filed this suit in district court alleging that Chicago's ordinance regulating newsstand operators violated the Commerce Clause and the First and Fourteenth Amendments to the Constitution. The plaintiff also sought injunctive relief to stop the city from enforcing its ordinance against him.

On June 28, 1991, some four months after Mr. Graff lodged his complaint, the City Council approved a new ordinance regulating newsstands. CHICAGO, ILL.MUN. CODE §§ 10–28–130–10–28–192 (1991).[1] The new ordinance is more specific about what factors city officials should consider in issuing permits; it also eliminates a provision in the old law that favored newsstands selling publications printed in Chicago. Mr. Graff then amended his action to attack the constitutionality of the new city ordinance under the First and Fourteenth Amendments, and he again requested injunctive relief. Sometime later Mr. Graff also filed a new permit application, which the Commission on Chicago Landmarks denied. In the court below, the city defended its ordinance as a content-neutral time, place and manner regulation. The district court, finding that Mr. Graff had mounted only a facial challenge to the newsstand law, upheld the constitutionality of the ordinance, 800 F.Supp. 576. Thus the court dismissed two counts of the complaint attacking the new ordinance, denied injunctive relief as moot, and removed Mayor Richard M. Daley as a defendant.[2] The district court did preserve one count of Mr. Graff's complaint based on the city's allegedly arbitrary and irrational treatment of his various applications for a permit under the old ordinance. The city does not contest the district court's decision to retain this one count.

As to the other two counts which the district court dismissed, we reverse. Because it gives too much discretion to an unelected decisionmaker, the Chicago ordinance violates the First Amendment of the United States Constitution.

I.

As a preliminary matter, defendant argues that this Court lacks jurisdiction to hear plaintiff's appeal because the judgment below is not final. Plaintiff asserts that we have jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1) to hear appeals from an interlocutory order denying injunctive relief. The district court dismissed with prejudice counts one and two of Mr. Graff's complaint. As a result, Judge Lindberg concluded that plaintiff could not prevail on the merits of his claim and so denied his motion for what the judge called a temporary restraining order. Defendant is correct that denial of a temporary restraining order is not appealable. *Geneva Assurance Syndicate Inc. v. Medical Emergency Services Ass'n*, 964 F.2d 599, 600 (7th Cir.1992) (per curiam). However, the character of the injunctive relief sought, not what the judge happens to call it, will determine whether it may be appealed. *Sampson v. Murray*, 415 U.S. 61, 85–88, 94 S.Ct. 937, 950–952, 39 L.Ed.2d 166 (1974). Temporary restraining orders are for brief periods (ten days plus one ten-day extension for good cause under Federal Rule of Civil Procedure 65(b)), *ex parte*, and informal. *Geneva Assurance Syndicate*, 964 F.2d at 600. In this case, Mr. Graff stated in his amended complaint that he sought a "preliminary and permanent injunction" against the city, not a temporary restraining order. The party's characterization of the relief sought is no more controlling than the judge's. In this case, however, a ten- or twenty-day injunction would have done little for Mr. Graff. Also, his prayer for relief was lodged in a formal complaint involving the opposing party. In no sense was Mr. Graff asking for a brief, *ex parte*, informal temporary restraining order; he was asking for a preliminary injunction, the denial of which is appealable to this Court.

The city also quotes *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), for the proposi-

---

**1.** Relevant portions of the ordinance are attached as an appendix.

**2.** Plaintiff does not contest dismissal of Mayor Daley.

tion that a party may not appeal an interlocutory order dismissing some, but not all, counts of a complaint while denying a motion for a preliminary injunction as moot. The defendant tries to fit this case under the rubric of interlocutory orders that have the *practical effect* of denying injunctive relief, as opposed to interlocutory orders that deny injunctive relief directly. According to defendant, the former may not be appealed unless the party can show (1) serious, perhaps irreparable consequences and (2) the order can be "effectually challenged" only by immediate appeal. *Carson*, 450 U.S. at 84, 101 S.Ct. at 996. Defendant's argument falters because this is not a practical effect case; the judge explicitly denied plaintiff's prayer for injunctive relief. Moreover, the cases cited by Justice Brennan in *Carson* to illustrate the irreparable injury requirement concerned plaintiffs who had not filed motions seeking a preliminary injunction. 450 U.S. at 84–86, 101 S.Ct. at 996–997. As we concluded above, Mr. Graff did petition the district court for a preliminary injunction.

■ Our decision in *Holmes v. Fisher*, 854 F.2d 229, 231 (7th Cir.1988), explicitly rejected the approach taken by some courts of requiring irreparable injury where there is no question that the plaintiff was denied injunctive relief: "Section 1292(a)(1) is decently plain: all interlocutory orders denying injunctions are appealable." *Id.* Yet even if this were a practical effect case, Mr. Graff would have little difficulty meeting the irreparable injury requirement. By denying his claim for injunctive relief and

by dismissing his constitutional challenge to the new ordinance, the lower court left the city free to force Mr. Graff out of the news-selling business, and the city did precisely that a short two months after the district court rendered its judgment. It is hard to imagine a more compelling case of irreparable injury.

## II.

This suit could involve as many as three separate claims: an as-applied challenge under the old ordinance, an as-applied challenge under the new ordinance, and a constitutional challenge to the new ordinance on its face. The facts surrounding Mr. Graff's treatment by defendant under the old ordinance are ultimately unnecessary to this discussion because the district court did not resolve those issues. Therefore, the as-applied attack on the previous ordinance is not properly before us. Similarly, we need not consider Mr. Graff's as-applied challenge to the new ordinance—assuming he raised such a claim—because the ordinance itself violates the Constitution.[3]

■ Mr. Graff is well placed to bring a facial challenge to the Chicago ordinance. In the free speech context, a plaintiff is entitled to challenge the constitutionality of a statute for delegating overly broad licensing discretion to an administrator, even if his conduct could be prescribed by a properly drawn statute. *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737–738, 13 L.Ed.2d 649 (1965). One has standing to make such a challenge to the face of a law even if the person has not applied for

---

**3.** Plaintiff had not applied for a permit under the new ordinance at the time he filed his amended complaint. This fact leads defendant to argue that Mr. Graff is precluded from raising an as-applied challenge to the new ordinance. What the city forgets is that Mr. Graff not only attacked the constitutionality of the ordinance in his amended complaint; he also requested injunctive relief. By asking the district court for a preliminary and permanent injunction restraining the city from enforcing its ordinance against him personally, plaintiff raised what amounts to an as-applied challenge. Nor can Mr. Graff be faulted for a failure of persistence in attempting to acquire a permit. He was rebuffed each of the several times he tried to apply. At the same time, the Commis-

sion on Chicago Landmarks did not deny Mr. Graff's application for a permit under the new ordinance until August 5, 1992, more than two months after the district court decided this case. This Court is hardly in a position to overturn a district court decision based on facts occurring after the lower court decision was rendered. In any event, it is unnecessary for us to resolve this issue because the ordinance is itself unconstitutional.

We also need not delve into plaintiff's contentions that the newsstand ordinance violates the Equal Protection Clause of the Fourteenth Amendment based on the city's allegedly favorable treatment of sidewalk cafes and vendors of items such as T-shirts as against newsstand operators.

a permit or license. *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741–742, 84 L.Ed. 1093 (1940). Courts are willing to overlook the usual requirements of the case or controversy doctrine in the First Amendment arena because of the fear that people will censor themselves, and because it is difficult to detect, review and correct content-based discrimination without standards by which to measure the licensor's action. *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988). "Self-censorship is immune to an 'as applied' challenge, for it derives from the individual's own actions, not an abuse of government power." *Id.* at 757, 108 S.Ct. at 2144. Just as in *Lakewood,* the licensing scheme in the instant case has two features that permit a facial challenge. First, vendors must apply for licenses that are periodically renewed by the issuer. Second, the licensing system at issue here is "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." *Id.* at 760, 108 S.Ct. at 2145. The Chicago ordinance is directed specifically at newsstand operators: "It shall be unlawful for any person to erect, locate, construct or maintain any newspaper stand * * * without obtaining a permit * * *." Chicago, Ill.Mun.Code § 10–28–130 (1991).

The city implies, and Judge Manion's dissent adopts the view, that Mr. Graff should not be permitted to bring a facial challenge because the Chicago ordinance does not regulate expressive conduct; in other words, the ordinance is outside the reach of the First Amendment (defendant's brief at 16–23). The dissent further contends that the ordinance does not vest unbridled discretion in a city official. Recall that under *Lakewood,* "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759, 108 S.Ct. at 2145. To a large extent, then, one's ability to mount a facial challenge depends on the resolution of the substantive questions of whether speech is implicated and whether decisionmakers have excessive authority. For the reasons set forth in this opinion, with which the dissent obviously disagrees, we conclude that the newsstand business implicates the First Amendment, that the ordinance vests excessive discretion in unelected administrators, and that a facial challenge to the city's licensing scheme is appropriate.

■ Mr. Graff disseminates newspapers and magazines; this activity goes to the heart of the First Amendment because the publications he sells give citizens vital information about public affairs. It is irrelevant that the newspaper vendors who are affected by the ordinance engage in this activity for profit. *Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959); *New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964). Nor is it relevant that these vendors do not have a hand in writing or publishing what they sell. It is doubtful, for example, that the Jehovah's Witnesses who distributed pamphlets and magazines in *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), wrote the materials herself, yet this fact did not stop the Supreme Court from overturning Mrs. Lovell's conviction under a constitutionally flawed licensing scheme. And our decision in *American Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323 (1985), *affirmed,* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), striking down an Indianapolis ordinance that outlawed pornography, did not grant the plaintiffs any lesser measure of First Amendment protection because they were book vendors rather than book writers. In other words, the First Amendment does not discriminate among those who peddle their own ideas and those who peddle the ideas of others.[4]

---

4. The dissent suggests that newsstand operators are not advocates for a point of view and so, presumably, are not deserving of full First Amendment protection. This proposition is empirically questionable, since newsstand operators do choose which publications to carry. Their decisions to sell or not sell pornography, religious literature and political publications are matters of judgment, advocacy and editorial discretion. In any event, there is nothing in First

As part of its argument that newsstands are not protected by the First Amendment, the city maintains that the central issue of this case is not Mr. Graff's freedom of expression but the right, or lack of right, to erect structures on public property. As defendant put it, "Graff can stand on the public way anywhere in the City and offer newspapers for sale" (defendant's brief at 20). This misses the point. Taking away a speaker's microphone may muzzle his speech as effectively as putting tape across his mouth. See *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (overturning ordinance that prohibited use of loudspeaker in public places without permission of chief of police). For obvious reasons, Mr. Graff finds the physical structure of the newsstand instrumental to his business: disseminating information. The stand gives him greater visibility, a stable location, and the ability to sell a wide variety of publications. Of course he can sell papers without the stand, as defendant flippantly suggests, but he can't sell them as effectively—imagine Mr. Graff standing on the streetcorner trying to hang on to dozens of magazines while Chicago's wind whips the papers out of his grasp. In *Lakewood* the Supreme Court recognized the constitutional significance of such implements of commerce when it struck down an ordinance regulating the placement of newsracks on public property. *Lakewood*, 486 U.S. 750, 108 S.Ct. 2138. If newsracks receive First Amendment protection, so do newsstands.[5]

The dissent chastises this analogy between newsstands and newsracks and maintains that the erection of newsstands is conduct, pure and simple. Divorced from the activity of distributing literature, the building of a stand on the sidewalk is indeed non-expressive conduct. Yet one cannot separate the activity involving the structure from the structure itself. Placing newsracks on public property is no more expressive in nature than building a newsstand. If there were no newspapers in the racks, there would have been no First Amendment issue in *Lakewood*. The Supreme Court found it necessary to protect newsracks in *Lakewood* not because there was any inherent First Amendment value in the mundane activity of placing metal boxes on streetcorners, but because the boxes facilitated the distribution of First Amendment material. Similarly, there is nothing mystical about a newsstand. There would be no First Amendment question if the city sought to regulate the erection of structures so that vendors could sell soda from the sidewalk. See *id.* at 761, 108 S.Ct. at 2146. Newsstands, however, serve only one purpose: to distribute literature, and the Supreme Court's analysis in *Lakewood* does not allow for disentangling the structure from the use made of the structure. The dissent finds newsstands different from newsracks because the latter are less permanent, smaller and "[w]hen they need fixing, they get repaired, not replaced" (at p. 1071). The significance of these distinctions is elusive. Most newsracks remain on the same corners for years and are permanent fixtures on the streetscape, just like newsstands. With all due respect, the First Amendment cannot turn on the trivial dis-

Amendment jurisprudence that modulates the level of protection based on how strongly the speaker identifies with the speech. The dissent's suggestion that only advocates should receive First Amendment protection would have dire consequences for, among others, publications that purport to report the news objectively.

5. The dissent argues that the standards we now apply would condemn the ordinance upheld in *Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325 (7th Cir.1991). Not so. In *Chicago Observer*, the city merely regulated the size of newsracks; it did not exercise licensing power to deny permit applicants the means to conduct business related to the First Amendment.

Moreover, the ordinance in *Chicago Observer* was directed at advertisements plastered on the outside of the boxes. Commercial speech receives lesser protection under the First Amendment. *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). An ordinance regulating merely the size of newsracks and the advertisements on their front is not relevant to this discussion. Indeed, if we were to adopt the dissent's expansive view of *Chicago Observer*, that decision would be at odds with the Supreme Court's decisions in *Lakewood* and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

tinction that rusted newsracks are replaced while weather-beaten newsstands are repaired with hammer and nails. The physical nature of the structure does not dictate the First Amendment protection it receives because the newsstand or newsrack is merely the conduit; and surely the recipients of First Amendment literature do not care whether their newsstand is repaired or replaced.

Judge Manion suggests that newsstands are more analogous to bookstores than to newsracks. Yet if the city had passed an ordinance directed specifically at the licensing of bookstores, is there any question that we would scrutinize the ordinance for its effect on free expression? In fact, the majority opinion in *Lakewood* specifically rejected the parallel drawn in Justice White's dissent—cited frequently by today's dissent—between newsracks and soda vendors, which attempted to separate the conduct of placing newsracks on public property from the expressive activity of distributing newspapers. *Id.* at 761, 108 S.Ct. at 2146. The real parallel, the Court opined, is between newsracks and leafleters, whose First Amendment rights are well established. *Id.* at 762, 108 S.Ct. at 2146 (citing *Lovell,* 303 U.S. at 447, 58 S.Ct. at 667). Newsstand operators are also businessmen. Yet they cannot be divorced from the substance of their business, which involves critical First Amendment activity, any more than booksellers or publishers distributing newspapers in newsracks. If anything, the analogy drawn in *Lakewood* between newsracks and pamphleteers is even stronger in this case where the vendors distribute publications by hand. It is true, as the dissent points out, that *Lakewood* rejected any distinction based on distribution by hand versus distribution by machine. We do not make any such distinction or grant one method of distribution any more First Amendment protection than the other. It is nevertheless true that the newsstand operator's means of distribution resembles the pamphleteer's method more than does the newsrack. In any event, both forms of distribution receive First Amendment protection. The newsstand, which falls somewhere between the two, must receive protection as well. The dissent says that we have vindicated Justice White's fear in his *Lakewood* dissent that newspaper publishers may seize public property for private use and ignore the governmental interests at stake. We have done no such thing. We hold only that a municipality must grant its citizens certain procedural safeguards where it seeks to license expressive activity, and we most emphatically reject the notion that private parties have any unassailable right to build structures on public property.

### III.

The court below mistakenly held that the city's ordinance is not a prior restraint. Chicago's ordinance forces news vendors to apply for a permit from local officials before they can sell papers from their newsstands. This licensing scheme creates a classic prior restraint by giving administrators the power to foreclose speech. Though not every prior restraint is invalid, the judiciary is vigilant in its oversight of prior restraints because of the fear that they deprive or delay access to information, and because restraints that lack procedural safeguards may lead to content-based discrimination. As the Supreme Court said in *Vance v. Universal Amusement Co., Inc.:*

> Any system of prior restraint * * * "comes to this Court bearing a heavy presumption against its constitutional validity." * * * The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

445 U.S. 308, 316 n. 13, 100 S.Ct. 1156, 1161 n. 13, 63 L.Ed.2d 413 (1980) (citations omit-

ted). The Supreme Court has held in a long line of cases that authority exercised to administer a licensing scheme must be bounded by clear and precise standards where officials have the power to foreclose speech in public places. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–151, 89 S.Ct. 935, 938–939, 22 L.Ed.2d 162 (1969); *Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958); *Kunz v. New York,* 340 U.S. 290, 293–294, 71 S.Ct. 312, 314–315, 95 L.Ed. 280 (1951); *Schneider v. New Jersey,* 308 U.S. 147, 161–162, 60 S.Ct. 146, 160–161, 84 L.Ed. 155 (1939); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). A prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman,* 380 U.S. at 58, 85 S.Ct. at 739. An ordinance must contain explicit limits on the decisionmaker's discretion. *Lakewood,* 486 U.S. at 769, 108 S.Ct. at 2150. In short, this Court is obligated to scrutinize closely the level of discretion granted to the Chicago official who licenses newsstand operators.

▇▇▇▇ The Supreme Court's 1990 decision in *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603, adapted the procedural safeguards of *Freedman,* a motion picture censorship case, to a licensing scheme for sexually oriented businesses. *FW/PBS* instructs us how to evaluate a licensing scheme to ensure that it contains adequate procedural safeguards. A city may only license a business associated with First Amendment freedoms if, first, the licensor is obligated to grant or deny the permit within a specified and reasonable time during which the status quo is maintained and, second, if there is the possibility of prompt judicial review in the event the license is erroneously denied. *Id.* at 228, 110 S.Ct. at 606. A ministerial action denying a license is not presumptively invalid, unlike most prior restraints, and the city is not required to justify its decision in court on every occasion. *Id.* at 229, 110 S.Ct. at 606–607. However, the vendor denied a license must be able to seek prompt judicial review, and the absence of review is fatal. See *Southeastern Promotions,* 420 U.S. at 561–562, 95 S.Ct. at 1248; *FW/PBS,* 493 U.S. at 229, 110 S.Ct. at 606–607.[6]

▇▇▇ The Chicago ordinance does not measure up under the dictates of *FW/PBS* and *Southeastern Promotions.* It does, however, contain some important safeguards. The ordinance guarantees prompt decisions on permit applications: between thirty-five and sixty-five days for initial permits and ten days for renewal permit applications. CHICAGO, ILL.MUN.CODE § 10–28–160(c) (1991). The ordinance also gives the Commissioner of Public Works explicit instructions to grant or deny permits only according to six factors: whether the design comports with the "quality and character of the streetscape"; whether the vendor complies with the ordinance; whether the vendor has previously operated a stand at the location; whether there are other newsstands in the area; how many daily publications will be carried; and whether the size of the stand relates to the number

---

**6.** The dissent takes issue with our reliance on *FW/PBS* because part of Justice O'Connor's opinion was joined by only two other justices. However, the dissent would rely on a dissent by Justice White, which was joined only by the Chief Justice. This splicing of justices is ultimately unavailing to the dissent's position because three other justices concurred in the judgment and criticized Justice O'Connor's position because the procedural safeguards she prescribed were not strong enough! Even if Justice White's opinion were compelling, which it is not, this Court would not be free to adopt its reasoning. Specifically, Judge Manion criticizes what he calls the "new slant" in Justice O'Con-

nor's opinion in *FW/PBS* that sees judicial review as an independent species of official discretion. Under the dissent's view, based on Justice White's dissent, a court would first have to determine whether municipal officials exercised too much discretion before it could reach the question of judicial review. This scheme, however, would render meaningless the requirement of judicial review. Either the court will have already found excessive discretion, in which case there is no need to reach the judicial review question, or the court will not find excessive discretion, in which case it is not permitted to reach the judicial review question. This cannot be what *Freedman* and its progeny intended.

of days it will be operating. Chicago, Ill. Mun.Code § 10–28–160(a)(1)–(6) (1991).

The ordinance's invitation to discriminate by type of publication is troubling. The Commissioner of Public Works is directed to consider "the number of daily publications proposed to be sold from the newspaper stand" as one of six factors in deciding whether to grant a permit. *Id.* While the city might legitimately favor daily publications, it offers no justification for this preference in the record. For all we know, the provision may be an attempt by officials to curry favor with the dailies, generally the most powerful and influential publications in a city.[7] These rather vague six criteria are in some theoretical sense valid limitations on the exercise of the Commissioner's discretion.[8] However, the Chicago ordinance fails to provide prompt judicial review—or review of any kind for that matter—and so flunks the second requirement of *FW/PBS*, 493 U.S. at 228, 110 S.Ct. at 606. The ordinance vests nearly absolute authority in one individual, the Commissioner of Public Works, so long as he is circumspect enough to couch any permit denial in terms of the six criteria. Without the strong check of subsequent review, the ordinance contains merely paper standards; it puts no substantive limits on the decisionmaker's authority. Though at first blush the statute offers elaborate procedural guidelines for the issuance and denial of permits, these are illusory. For example, section 10–28–160(a) outlines procedures for hearings and reports by which a City Council committee is to comment on a proposed newsstand license, and it guarantees the vendor the right to be heard in such proceedings. However, these procedures are entirely optional; under the ordinance

the City Council could decide not to comment on newsstand applications at all. In fact, the new section 10–28–160 replaces a provision in the older ordinance requiring the full City Council to approve all permits. The new section 10–28–160 instructs the Commissioner of Planning to advise the Commissioner of Public Works, but there is nothing requiring the Public Works Commissioner to accept or even consider his colleague's advice. The only time the Public Works Commissioner shares decisionmaking authority is when a newsstand vendor seeks a permit to erect a structure on a designated historical landmark. In such cases—including Mr. Graff's application for a stand outside the City of Chicago Cultural Center—the Commission on Chicago Historical and Architectural Landmarks must approve. In all other cases, the Commissioner of Public Works is the sole, unfettered decisionmaker. It is a measure of the leniency of the city's criteria that Mr. Graff's application was ultimately denied even though his stand has operated on approximately the same site for seventy years. Though one of the six criteria in the ordinance is longevity, this did not help Mr. Graff.

The lone reference in the ordinance to subsequent review of the Commissioner's decision is almost laughably inadequate. Under section 10–28–160(c), a vendor whose application is denied has ten days to request a hearing "at which he will be given an opportunity to prove that the determination of the Commissioner was in error." The ordinance does not define error or specify what proof is required. And the person who reviews the decision by the Commissioner of Public Works is none other than the Commissioner of Public Works!

---

**7.** The dissent contends that the city has offered several justifications for favoring daily newspapers, and quotes from its brief a statement concerning clutter on the public way. We fail to see, however, why magazines or weekly newspapers should create any more clutter on the public way than dailies.

**8.** Section 10–28–191 gives the Commissioner of Public Works "authority to adopt such orders, rules and regulations as he may deem necessary * * *." This resembles a provision in *Lakewood* to which the Supreme Court took excep-

tion, which gave Lakewood's mayor the power to set "such other terms and conditions deemed necessary and reasonable by the Mayor." *Lakewood*, 486 U.S. at 769, 108 S.Ct. at 2150. The Chicago ordinance contrasts favorably because the open-ended clause apparently is restricted by the six criteria of section 10–28–160(a). On the other hand, the language is sufficiently vague on this critical point that, should the City Council resurrect this ordinance, a future court would be forced to dwell on the meaning of this open-ended provision.

The ordinance merely instructs the Commissioner to issue a permit promptly if he "determines that his previous determination was incorrect." CHICAGO, ILL.MUN. CODE § 10–28–160(c) (1991).

▆▆▆▆ Defendant's supplemental brief attempts to save this glaring absence of subsequent review by noting that a dissatisfied applicant may obtain judicial relief in state court by writ of common law certiorari, or in federal court by way of 42 U.S.C. § 1983. While it is in some sense true that a person denied a license is not precluded from filing suit in state or federal court alleging constitutional deprivation, full-bodied judicial review requires more. In *FW/ PBS*, for example, the Supreme Court found that the city ordinance requiring licenses for sexually oriented businesses did not offer sufficient judicial review. 493 U.S. at 229, 110 S.Ct. at 606. Though the ordinance in *FW/PBS* is not reprinted in the Supreme Court's opinion, the plaintiffs in that case also retained a right to file suit in state or federal court—which of course they did—yet this did not satisfy the judicial review requirement. If mere silence on the question of judicial review were sufficient, leaving only the theoretical avenue of redress of claiming a constitutional violation in the courts, then the procedural requirement of *Freedman, Southeastern Promotions, FW/PBS* and a host of other cases would be redundant or meaningless. The Chicago ordinance does not provide genuine judicial review, much less the prompt and guaranteed judicial review required of a statute that licenses expressive conduct.

The city goes to great lengths in its papers to assure this Court that it has no intention to put its licensing authority to ill use, urging us, in essence, to relax our standards. Defendant contends, for example, that it could not discriminate on the basis of content because permit applications do not contain a list of what publications a particular newsstand sells (defendant's supplemental brief at 8–9). This is hardly comforting. City officials, were they so inclined, could evacuate their bureaucratic desks for the afternoon, stroll over to a stand and examine for themselves what magazines are sold. Defendant also contends that all newsstands sell all manner of publications, so that there is no danger of content discrimination in the permit process (defendant's supplemental brief at 9). Defendant offers no proof for the proposition that all newsstands sell exactly the same publications, and we rather doubt its accuracy. Indeed, it is not difficult to imagine a city wielding its power to deny a permit to newsstands selling underground papers sharply critical of municipal officials. Or the city could use its licensing scheme to punish vendors who sell pornographic magazines that are otherwise constitutionally protected. The ordinance contains no minimum or maximum limit on the number of permits issued. Thus, were the Commissioner seeking to punish a stand for selling a particular publication, he would not face the obstacle of having to find a replacement vendor.

▆▆▆▆ Plaintiff, having brought a facial challenge, cites no specific instance in which the city has abused its licensing authority, but a facial challenge requires us to be vigilant in the protection of expressive freedom, and implores us not to assume governmental restraint. As the Supreme Court said in *Lakewood:*

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows.

486 U.S. at 770, 108 S.Ct. at 2150. The dissent accuses us of being picky, of "tak[ing] a microscope to the ordinance * * *," of giving the city too little guidance, and of not sufficiently appreciating that Chicago "was searching for a reasonable alternative to either prohibiting newsstands entirely or permitting newsstands at will" (at pp. 1079–80). Such criticism misapprehends the role of this Court, particu-

larly in the area of the First Amendment. The judiciary's role is not to act as legislative adviser or to bend backward to accommodate the city's goals. Where a municipality takes up the power to license an activity that involves speech, the burden is on the city, not the speaker. The dissent puts forth the extraordinary proposition that "[o]nly if the government discriminates on the basis of the content of speech should the ordinance be scrutinized under the First Amendment" (at p. 1074). This would essentially eliminate the doctrine of prior restraints. If courts were compelled to wait until the government discriminated on the basis of content, they would lack the power to review licensing schemes in advance of their application and to require procedural safeguards. This view cannot be correct.

## IV.

 The district court decision makes much of the city's contention that its licensing scheme is a content-neutral time, place and manner regulation. This may well be, but it is of no import when an ordinance fails to provide adequate procedural safeguards in a licensing scheme directed at First Amendment-protected activity. Such a licensing program is unconstitutional even if it is a content-neutral time, place and manner restriction. *FW/PBS*, 493 U.S. at 223, 110 S.Ct. at 603. In that decision, for example, the Supreme Court held that it needn't reach a Court of Appeals finding that the ordinance at issue was a "content-neutral time, place, and manner restriction aimed at secondary effects arising out of the sexually oriented businesses" because the procedural safeguards built into the licensing scheme were inadequate. *Id.* Therefore, the district court's lengthy discussion of the content-neutral and time, place and manner aspects of the Chicago ordinance is also irrelevant, and the dissent's suggestion that the case should be remanded to allow the city to present its justifications for censorship is unpersuasive. If an ordinance lacks sufficient procedural safeguards, there is no

point in pursuing the time, place and manner analysis. It is worth noting, however, that the district court's discussion of these issues applies the incorrect test.

 Mr. Graff's First Amendment activity takes place on a traditional public forum: the sidewalk. *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). As the Supreme Court recognized in *Hague v. CIO:*

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Speech in such a traditional public forum as a sidewalk is accorded a special status in constitutional jurisprudence. *Grace*, 461 U.S. at 180, 103 S.Ct. at 1708. In traditional public fora, the government's power to restrict expressive conduct is extremely circumscribed. The government may only enforce reasonable time, place and manner regulations that are content neutral, narrowly tailored to serve a significant governmental interest, and which leave open alternative channels of communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).[9]

 Defendant attempts to draw an analogy between this case and our decision in *Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341 (1990), in which we upheld the refusal of officials to permit erection of a Chanukah menorah alongside Christmas trees placed by the city as seasonal decorations at O'Hare International Airport. As the Supreme Court pointed out in its last term, however, an airport is not a traditional public forum merely be-

---

9. The government may also enforce a content-based regulation that is necessary to serve a compelling state interest and which is narrowly drawn to achieve that end.

cause the public is freely invited. *International Soc. for Krishna Consciousness v. Lee,* ― U.S. ―, ―, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541 (1992).[10] Unlike an airport, the sidewalks from which Mr. Graff hawks his newspapers and magazines are longstanding public fora on which expressive activity receives special protection. The opinion below did not apply any special scrutiny to the ordinance because it limits speech in a traditional public forum. In fact, the district court's memorandum opinion and order does not so much as mention the phrase "public forum."

 Even if the judge had been correct that the city's licensing scheme is not a prior restraint, he would still have erred in not applying the test set forth in *Perry Education Ass'n.* Though he found that the regulation is content neutral, and merely a time, place and manner regulation, he failed to measure either the city's proposed interests in regulating expressive conduct or the availability of alternative channels of communication. *Perry Education Assn.,* 460 U.S. at 45, 103 S.Ct. at 955. If for no other reason than this, we would be forced to remand.

### V.

 For the reasons stated above, we hold that the Chicago ordinance violates the First Amendment of the Constitution. Section 10-28-192 of the ordinance is a severance clause intended to rescue the statute should certain portions be found unconstitutional. However, this provision cannot salvage the newsstand ordinance because the statute is doomed by its omissions rather than its excesses. As this case has proceeded, the city has not filed an answer. Because the ordinance is un-- constitutional on its face, and that question of law has been fully briefed and argued in this Court, there is no occasion on remand to call for an answer. The dismissal of counts one and two is reversed and the

cause is remanded with instructions to enter an injunction prohibiting the city from removing plaintiff's newsstand and from otherwise enforcing the present ordinance against him.

### APPENDIX

Relevant portions of the Chicago municipal ordinance governing newsstands are as follows:

10-28-130. It shall be unlawful for any person to erect, locate, construct or maintain any newspaper stand on the public way or on any other unenclosed property owned or controlled by the City without obtaining a permit therefor from the Commissioner of Public Works as hereinafter provided. * * *

10-28-135(b). The Commissioner of Public Works may from time to time reissue all or a portion of those permits that have been revoked or have expired. * * *

10-28-150. Application for a permit for a newspaper stand or for renewal of such permit * * * shall contain * * * the number of daily publications and other publications that will be sold from the stand * * * and a statement that such permit will be accepted subject to the conditions and provisions thereof. * * *

10-28-160(a). * * * [T]he Commissioner shall deliver a duplicate of the application to the Commissioner of Planning and to the alderman of the ward in which the newspaper stand is or will be located. Upon receipt of such application, the alderman may refer the application to the City Council's Committee on Transportation and the Public Way for the purpose of conducting public hearings on the proposed permit application. All interested persons, including the applicant, shall be given an opportunity to be heard at such hearings. After conducting such hearings, the Committee may issue a report summarizing the issues that

---

**10.** The dissent notes correctly that *International Soc. for Krishna Consciousness* was decided after our decision in *Lubavitch Chabad House, Inc.* We are compelled, of course, to read our precedents in light of subsequent Supreme Court opinions. In any event, *Lubavitch Cha-* *bad House* does not address the question of procedural safeguards for licensing speech. The primary holding of the case is that there is no constitutional right to erect structures on public property, a position fully consistent with the Court's decision today.

were addressed at the hearings and recommending approval or denial of the application. * * * The Committee's report on the permit application shall be based solely on the following considerations:

(1) Whether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses;

(2) whether the newspaper stand complies with this Code;

(3) whether the applicant has previously operated a newspaper stand at that location;

(4) the extent to which services that would be offered by the newspaper stand are already available in the area;

(5) the number of daily publications proposed to be sold from the newspaper stand; and

(6) the size of the stand relative to the number of days the stand will be open and operating.

Any Committee report recommending disapproval of a permit application must state the specific reasons for the recommendation, which reasons shall be consistent with an applicant's constitutional rights contained in the First, Fifth and Fourteenth Amendments of the United States Constitution. * * *

In acting on all applications filed pursuant to this subsection, the Commissioner of Public Works shall give due consideration to the Committee's report, if any, and to the recommendation of the Commissioner of Planning, and shall be bound by the same standards as apply to the Committee in approving or denying a permit.

Notwithstanding any other provision to the contrary, any application under this subsection (a) for a permit for a newspaper stand to be located on property on which a designated landmark is situated, or on the public way between the street and the property line of such property, shall be subject to permit review by the Commission on Chicago Historical and Architectural Landmarks. * * *

(c) Any action denying or approving a permit application under subsection (a) of this section shall be made by the Commissioner of Public Works not less than 35 and not more than 65 days after the application is filed with the Commissioner. Any action denying or approving a permit application under subsection (b) shall be made by the Commissioner of Public Works within 10 days after the application is filed with the Commissioner. If the Commissioner denies the application, he shall notify the applicant by mail of the reasons for his decision. Within 10 days after notice of denial of an application is sent, the applicant may request a hearing at which he will be given an opportunity to prove that the determination of the Commissioner was in error. The Commissioner of Public Works (in cooperation with the Commissioner of Planning if the denial was based on his determination) shall schedule a hearing to be held within 30 days after he received the request.

If, after the hearing, the Commissioner of Public Works determines that his previous determination was incorrect, the Commissioner shall promptly issue or renew the permit. * * *

(e) [W]hen two or more otherwise equally qualified applications are pending for new newspaper stands that are to be located in any area of the City in which only one new newspaper stand is permitted, preference shall be given to the application for the newspaper stand offering the largest number of different daily publications. * * * 10–28–165(b). * * * Such permit shall remain valid until May 1st of the year following the year in which it is issued and may be renewed as provided in this Article. * * * 10–28–191. The Commissioner of Public Works shall have the authority to adopt such orders, rules and regulations as he may deem necessary for the proper administration and enforcement of the provisions of this Article. 10–28–192. The provisions of sections 10–28–130 through 10–28–192 are severable. If any section, clause, provision, portion or application of those sections is determined by any court to be invalid for any reason, the validity of the remaining sections, clauses, provisions

or portions, and their application to other circumstances, shall not be affected thereby. It is the intention of the City Council that those sections would have been enacted by the City Council regardless of the invalid sections, clauses, provisions, portions or applications. * * *

MANION, Circuit Judge, dissenting.

In this case the court strikes down the ordinance on its face. I respectfully dissent on three separate and independent grounds. First, the newsstand ordinance does not involve speech under the protections of the First Amendment. Second, a facial challenge is not permitted (Graff should have applied for, and been denied, a permit before filing suit). Third, even if a facial challenge were possible, I would remand for a determination of whether the ordinance contains reasonable time, place and manner restrictions that serve a substantial governmental interest and whether alternative avenues of communication are available.

## I. Structure or Speech?

Part IV of the court's opinion holds that a newsstand occupying a sidewalk involves a traditional public forum. I disagree. The newsstands target the general public and may, as in this case, operate on public land. *See Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 802–03, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). But the building of a newsstand is not a form of constitutionally protected expression. At least the court appears not to hold that Graff has a constitutional right to build newsstands on public property. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 762 n. 7, 108 S.Ct. 2138, 2147 n. 7, 100 L.Ed.2d 771 (1988). Rightly so. There is no

private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures. Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor

has it ever been construed to mandate, that any person or group be allowed to erect structures at will.

*Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341, 347 (7th Cir.1990). *Accord Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 813–15 and n. 32, 104 S.Ct. 2118, 2133–34 and n. 32, 80 L.Ed.2d 772 (1984). The court distinguishes *Lubavitch* on the basis that an airport is not a traditional public forum, citing *International Soc'y for Krishna Consciousness v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541 (1992). The *Krishna* case was decided two years after *Lubavitch.* The Seventh Circuit established a direct holding that in a case that involves a public forum, there is no constitutional right to erect structures. *Id.,* 917 F.2d at 347. Unless the structure of a Chanukah menorah deserves less protection than the structure of a newsstand, *Lubavitch* is dispositive of this case. Although a case involving an airport would now receive a different analysis under *Krishna,* the major teachings of *Lubavitch* remain to guide us in cases such as this one.

In *Lakewood* a newspaper challenged a city ordinance that allowed the mayor to grant or deny permits to publishers to place their newsracks on public property. The mayor had to state specific reasons if he denied the application; in granting a permit, the mayor could add such terms and conditions he deemed reasonable and necessary. The newspaper elected not to apply for a permit, instead bringing a facial challenge to the ordinance. 486 U.S. at 754, 108 S.Ct. at 2142.

[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.... The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

*Id.* at 759, 108 S.Ct. at 2145. The Court found the First Amendment implicated because the specific ordinance involved news-

papers and required them to renew their newsrack licenses annually. The Court saw the printing and circulation of newspapers as "conduct commonly associated with expression" and the periodic licensing scheme as closer to a regulation that allows the government to view actual speech content before issuing a permit.

The court in the present case uses *Lakewood* in holding that "If newsracks receive First Amendment protection, so do newsstands." [p. 1062]. But *Lakewood* does not so conveniently bridge the gap between newsracks and newsstands. Although the court in *Lakewood* rejected Justice White's dissent, which drew an analogy between newsracks and soda vendors, this court goes so far as to see an even stronger analogy between newsstands and soda vendors because the newsstand operators "distribute publications by hand." [p. 1063]. *Lakewood* called this particular point a "meaningless distinction." *Id.* at 762, 108 S.Ct. at 2146. The fact that newsracks do not involve hand distribution makes the need for the First Amendment, "if anything, greater for newsracks than for pamphleteers." *Id.* Thus, the court in this case uses hand distribution to boost a First Amendment analysis under *Lakewood,* contrary to the Supreme Court's statements that hand distribution is less in need of First Amendment protection than publications passively distributed by machines. The proper parallel is in the *Lakewood* opinion itself.

> [A] law requiring building permits is rarely effective as a means of censorship. To be sure, on rare occasion an opportunity for censorship will exist, such as when an unpopular newspaper seeks to build a new plant. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse. And if such charges are made, the general application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision.

*Id.* at 761, 108 S.Ct. at 2146. The court in this case sees newsstands as similar to newsracks and leafletters. They are significantly different, however. Newsstands are large, permanent-type structures. They are constructed, not placed; they do not walk around. Newsstands are not advocates; rather they supply many and varying editorial opinions. Newsstands to some extent protect vendors from the weather. And they are not easily moved. Newsstands shelter a business operation; they do not merely dispense or hand deliver newspapers. When they need fixing, they get repaired, not replaced. Finally, building and operating a newsstand is conduct, not speech, which the City can lawfully prescribe:

> Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

*Schneider v. State,* 308 U.S. 147, 160–61, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); *accord International Soc'y for Krishna Consciousness v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2711, 2717, 120 L.Ed.2d 541 (1992)

("The principal purpose of streets *and side-walks*, like airports, is to facilitate transportation, not public discourse." (emphasis added)). While the Supreme Court holds that newsracks involve activity commonly associated with expression, such as the circulation of newspapers, the First Amendment does not go so far as to give newsstands and similar structures the same treatment.

> While there is a First Amendment right to publish newspapers, publishers have no right to force municipalities to turn over public property for the construction of a printing facility. There is a First Amendment right to sell books, but we would not accept an argument that a city must allow a book seller to construct a book shop—even a small one—on a city sidewalk. The right to leaflet does not create a right to build a booth on city streets from which leafletting can be conducted. Preventing the "taking" of public property for these purposes does not abridge First Amendment freedoms.

*Lakewood*, 486 U.S. at 780, 108 S.Ct. at 2156 (White, J., dissenting). The newsstand is more analogous to the construction of a printing facility, book shop or booth, than to a newsboy or newsrack.[1] Although newsstands do contribute to newspaper circulation, the method of that circulation sufficiently distinguishes newsstands from newsracks as to require distinct treatment.[2] This case neither concerns simply the circulation and printing of newspapers nor "conduct commonly associated with expression." This case involves a structure, a topic within the domain of city ordinances since the very first city council convened.

## II. Facial or As–Applied Attack?

Even assuming that newsstands somehow equate with speech, the second hurdle is whether a facial challenge is permitted. Courts are reluctant to entertain facial attacks, where the statute may be declared unconstitutional in all instances. The usual approach is to wait until a statute is applied in the suspected and offensive way. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 223, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990); *Lakewood*, 486 U.S. at 774–75, 108 S.Ct. at 2153 (White, J., dissenting). In this case the court holds that a facial challenge is permitted for two reasons: the ordinance requires periodic license renewal and the licensing system is "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." [p. 1061], *citing Lakewood*, 486 U.S. 750, 760, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771. Such a test would allow facial challenges in almost every First Amendment case. Contrary to the court's citation, *Lakewood* used these reasons to address whether newsracks implicated speech, as that term is used under the protections of the First Amendment. In addition to finding that newsracks involve "speech", *Lakewood* holds that:

> when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license.

*Id.* at 755–56, 108 S.Ct. at 2143 (citations omitted). Since we are here assuming for the sake of argument that a newsstand

1. In *Lakewood*, 486 U.S. at 781–82, 108 S.Ct. at 2157–58, Justice White feared that equating newsracks with newsboys and conduct commonly associated with expression allows newspaper publishers the right to take public property for private use and ignores the governmental interests at stake: allowing all members of the public use of their streets and sidewalks, insuring the public's safety and aesthetic interests, especially where alternative methods of newspaper distribution are available. The court responds that "The physical nature of the structure does not dictate the First Amendment protection it receives because the newsstand or

newsrack is merely the conduit." *Supra*, p. 1063. This extension of the rule makes no allowance for the degree the public is obstructed in walking on their sidewalks. If the ordinance in the present case is struck down, Justice White's fears in 1988 have become Chicago's reality in 1993.

2. In *Lakewood* the newspaper publisher argued that it was not seeking to rent or permanently build a structure on the sidewalk; the newsrack was characterized as similar to a newsboy, and the newsrack his "mechanical cousin." *Id.* at 778 n. 6, at 2155 n. 6.

represents "expressive activity," the key inquiry is whether the licensor's discretion is unbridled because "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Id.* There are two reasons for this inquiry. First, only if the licensor's discretion is limited will potential applicants not be intimidated into censoring their own speech by not applying for a license. Second, the lack of express standards makes the plaintiff's burden of proof and judicial review of a licensing decision difficult on the question of whether the decisionmaker had really disfavored certain speech, *id.* at 758, 108 S.Ct. at 2144, or was otherwise unconstitutionally motivated. *Id.* at 759, 108 S.Ct. at 2145. At a minimum, *Lakewood* excused the newspaper from applying for a newsrack permit and allowed a facial challenge to the ordinance because the ordinance involved expressive activity; the opinion can also be read to inquire into the extent that the licensor's unbridled discretion threatens to censor speech before allowing a facial challenge.

Whether the ordinance was attacked on its face or as applied, a major premise in *Lakewood* is that "the Constitution requires that the City establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Id.* at 760, 108 S.Ct. at 2145. The Court struck down the ordinance specifically because there were "no explicit limits on the Mayor's discretion." *Id.* at 769, 108 S.Ct. at 2150. In denying a permit application, the Mayor was required only to state "it is not in the public interest." Although the ordinance required the Mayor to state his reasons, the Court found troubling the lack of specificity required and the limitless reasons the Mayor could assert. *Id.* at 771, 108 S.Ct. at 2151. In granting a permit, the Mayor could require the newsrack to be located "in an inaccessible location without providing any explanation whatsoever." *Id.* at

769, 108 S.Ct. at 2151. This constituted "unfettered discretion" abridging the First Amendment. *See FW/PBS*, 493 U.S. at 223, 110 S.Ct. at 603; *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965) ("one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion"); *Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940) (the offending statute subjected the defendant to "harsh and discriminatory enforcement by local prosecuting officials"). In the context of whether to permit a facial challenge, the court in this case does not address the question of unfettered discretion.[3] I would hold that the ordinance does not give the Commissioner unfettered discretion.

The ordinance provides for prompt decisions on initial and renewal permit applications, and lists six criteria by which the Commissioner may grant or deny permission to build a newsstand. As the court suggests, many of the criteria do not censor a newsstand operator, including such factors as

> whether the design [of the newsstand] comports with the "quality and character of the streetscape"; whether the vendor complies with the ordinance; whether the vendor has previously operated a stand at the location; whether there are other newsstands in the area, ... and whether the size of the stand relates to the number of days it will be operating.

[pp. 1064–65]. By requiring the Commissioner to consider these factors, his discretion is limited, not unbridled. A person cannot feel intimidated into censoring his speech just because he would otherwise build a newsstand that blocks another business's display window, disregard paying any permit fee, or build a newsstand as a start-up business next door to another one, only to be open one day a week. Obviously, no two newsstands can occupy the same spot at the same time. These criteria give

---

**3.** The court does address unfettered discretion in the context of whether the ordinance contains sufficient judicial review provisions, wherein the court is willing to assume for the sake of argument that the ordinance contains valid limitations on the Commissioner's discretion. [p. 1065].

adequate and specific guidance to the Commissioner, and predictable reasons to the applicant, as to why a particular permit to build a newsstand should be preferred. If a permit to build a newsstand were denied, these express standards give the plaintiff adequate guidance in challenging the application of the ordinance to his particular case, and upon judicial review allows an informed inquiry into whether the Commissioner made his decision in an unconstitutional manner, such as by disfavoring certain speech. The factors outlined in the ordinance are subjective and involve a weighing of interests. By denying and granting more and more permits, the Commissioner's subjective decisions and weighing of interests can be held to a consistency standard; if the plaintiff is denied a permit, yet a similar (or a less satisfactory) distributor is granted a permit under like circumstances, the ordinance gives the plaintiff a road map in how to prove whether the Commissioner denied a permit for reasons unconstitutional.

This court finds troubling the Commissioner's ability to consider how many daily publications the newsstand will carry. [p. 1065]. This factor does not infringe, but rather fosters, the interests of the First Amendment that Graff challenges. *See Gannett Satellite Info. Net. v. Metro Transp. A.*, 745 F.2d 767, 774 (2d Cir.1984) ("the newspapers are in a privileged position and are not and will not become the victims of discrimination"). The ordinance clearly favors an applicant who has the higher, not the lower, proposed number of publications to be sold from the newsstand. This conceivably censors only the newsstand operator who himself might censor certain publications from distribution. In addition, an ordinance directed at the number of publications concerns quantity, not quality. Graff cites no case where an ordinance promoting speech (in general) infringes the First Amendment. Only if the

government discriminates on the basis of the content of speech should the ordinance be scrutinized under the First Amendment.

The ordinance addresses the speech content in two ways. First, the ordinance favors the newsstand that will carry more *daily* publications. Second, the ordinance permits the newsstand to carry only "newspapers, periodicals and similar publications." Chicago, Ill.Mun.Code § 10–28–180 (1991). The court concludes that these provisions may be an attempt to "curry favor with the dailies." The City readily admits that the "intended function" of the ordinance "is merely a preference for newsstands that maximize the number of newspapers sold." The court also states that "While the city might legitimately favor daily publications, it offers no justification for this preference in the record." [p. 1065]. The City can and does offer legitimate reasons to favor daily publications.

The district court granted the City's motion to dismiss two of three counts in the complaint. The district court thus denied injunctive relief because of an insufficient likelihood of success on the merits. With this ruling there was never any need for the City to present any justification for its ordinance, especially in light of Graff presenting a facial challenge. On appeal, the City offers a variety of legitimate reasons to favor the dailies.

> [R]estrictions on what can be sold have nothing to do with the viewpoint expressed in the items sold from newsstands. They are simply an effort to reduce clutter on the public way.... This type of ordinance, designed to facilitate the distribution of newspapers from a newsstand without undue obstruction of the public ways, is viewpoint neutral.[4]

As a practical matter, people purchase newspapers in seconds. The more time-consuming purchase of books or video-

---

4. The City also argued in the district court that prior Supreme Court decisions allow the City to provide more outlets for the sale of daily publications than for the sale of other "expressive materials." *See, e.g., Lakewood* [486 U.S. at 771–72, 108 S.Ct. at 2152], 100 L.Ed.2d at 792 (uniqueness of daily newspapers requires public access at a particular time); *Gannett Satellite Inf. Net. v. Metro Transp. A.*, 745 F.2d 767, 773–4 (2d Cir.1984) (upholding as content neutral regulation which allowed newspapers but not other vendors to install coin operated vending machines).

tapes, in contrast, would obviously obstruct the public way. The only reason that a factual record might prove necessary is if the preference for daily newspapers and the restriction against books or videotapes qualifies as an unwarranted infringement of speech. As I discuss in Part III, *infra*, I would leave for the district court on remand the question of whether "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). It seems that the book-videotape dispute is an excuse to magnify a First Amendment issue. At the very most this isolated factor can be severed from an otherwise valid ordinance.

The court reverses the district court for one reason: that the "ordinance fails to provide prompt judicial review—or review of any kind for that matter—and so flunks the second requirement of *FW/PBS*, 493 U.S. at 228, 110 S.Ct. at 606." [p. 1065]. The court's entire opinion relies on *FW/PBS*.

In *FW/PBS* the city of Dallas attempted to curb the secondary effects of crime and urban blight by regulating the activities of sexually oriented businesses. 493 U.S. at 220, 110 S.Ct. at 602. The ordinance subjected these businesses to "zoning, licensing, and inspections." *Id.* at 220–21, 110 S.Ct. at 602. Part II of Justice O'Connor's plurality (three Justices) opinion, specifically relied upon by the court in this case, presented two holdings: (1) "petitioners may raise a facial challenge to the licensing scheme, and that as the suit comes to us, the businesses challenging the scheme have a valid First Amendment interest," *id.* at 225, 110 S.Ct. at 604; and (2) the failure to "provide for an effective limitation on the time within which the licensor's decision must be made," and the failure to "provide an avenue for prompt judicial review so as to minimize suppression of the

speech" renders the ordinance unconstitutional, (two of three procedural safeguards recited in *Freedman* ). *FW/PBS*, 493 U.S. at 229, 110 S.Ct. at 606.[5] Only two other Justices (Stevens & Kennedy) joined in these holdings. Justice Brennan, joined by Justices Marshall and Blackmun concurred only in the judgment. They would have added to the second holding a requirement that the government "bear both the burden of going to court and the burden of proof in court" (the third *Freedman* safeguard). *FW/PBS*, 493 U.S. at 239, 110 S.Ct. at 612. Thus, *FW/PBS* certainly narrowed the *Freedman* doctrine; where a licensing scheme requires "adult" businesses to procure a license before engaging in business, only two of the three procedural requirements survived. *FW/PBS*, 493 U.S. at 229–30, 110 S.Ct. at 608–09. Justice Scalia, dissenting, rejected the first holding, arguing to not allow a facial attack on the ordinance. *Id.* at 262, 110 S.Ct. at 624. Justice White, joined by Chief Justice Rehnquist, also dissented and rejected the second holding that the ordinance had to include the *Freedman* safeguards. *Id.* at 244, 110 S.Ct. at 614.

In *FW/PBS*, the city did not contest that the businesses challenging the ordinance had "a valid First Amendment interest." *Id.* at 225, 110 S.Ct. at 604. The city did not argue that the ordinance did not raise First Amendment concerns. *Id.* at 224, 110 S.Ct. at 604. Even though the ordinance involved an inspection scheme that applied to all businesses, the Court found that the ordinance "largely targets businesses purveying sexually explicit speech which the city concedes ... are protected by the First Amendment," *id.*, and that "the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses." *Id.* at 225, 110 S.Ct. at 604.

In the present case the City of Chicago disputes that the First Amendment pro-

---

**5.** Justice Brennan summarized the three *Freedman* safeguards as follows:

(1) any prior restraint in advance of a final judicial determination on the merits must be no longer than that necessary to preserve the status quo pending judicial resolution; (2) a

prompt judicial determination must be available; and (3) the would-be censor must bear both the burden of going to court and the burden of proof in court.

*FW/PBS*, 493 U.S. at 239, 110 S.Ct. at 612.

tects the construction of newsstands. This case neither concerns simply the distribution of newspapers nor conduct commonly associated with expression. Nor is the ordinance more unreasonably burdensome with respect to newspaper distributors as compared to other businesses. The primary reason I reject a facial challenge to the ordinance is because a newsstand is a structure, not speech. This case thus involves contested conclusions that *FW/PBS* assumed were admitted. Thus, *FW/PBS* is not controlling because the Supreme Court did not address to what extent the judicial safeguards in *Freedman* should apply in cases even tangentially involving First Amendment protection.

The second reason I oppose a facial challenge (the Commissioner's lack of unbridled discretion in the ordinance) directly involves the *FW/PBS* case. Justice O'Connor addresses whether the Dallas ordinance involves unbridled discretion and the lack of judicial review in two entirely different contexts: First, whether the ordinance is susceptible to a facial challenge. *Id.* at 223–25, 110 S.Ct. at 603–04. Second, whether the ordinance is unconstitutional as a prior restraint on speech. *Id.* at 225–29, 110 S.Ct. at 604–06.

In *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559–60, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975), and *Freedman*, 380 U.S. at 58, 85 S.Ct. at 739, the Supreme Court held that a system of prior restraint offends the Constitution if it lacks certain safeguards, including prompt judicial review. But in both cases, before the Supreme Court addressed the issue of a lack of judicial review, the prerequisite finding was that the government officials had too much discretion. *Southeastern*, 420 U.S. at 553, 95 S.Ct. at 1244 ("unbridled discretion"); *Freedman*, 380 U.S. at 56, 85 S.Ct. at 737 ("overly broad licensing discretion"). *Accord Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969) (the ordinance gave the city commission "virtually unbridled and absolute power to prohibit" certain speech); *Staub v. City of Baxley*, 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1957) ("uncontrolled discre-

tion"); *Kunz v. New York*, 340 U.S. 290, 293, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1951) (discretion based upon the police commissioner's personal interpretation at a given time). *Cf., Riley v. National Fed'n of the Blind*, 487 U.S. 781, 786–87, 793–94, 108 S.Ct. 2667, 2672, 2676, 101 L.Ed.2d 669 (1988) (the government had left the standard of reasonableness of a fundraiser's fee to a case by case judicial standard). In *FW/PBS*, however, Justice O'Connor seemed not to confine these cases, or *Freedman* specifically, to cases where the Supreme Court made a prerequisite finding that the government officials had too much discretion before considering whether judicial review was available. Rather, Justice O'Connor asserted a new slant on our inquiry:

> In *Freedman*, we held that the failure to place limitations on the time within which a censorship board decisionmaker must make a determination of obscenity is a species of unbridled discretion. See *Freedman*, [380 U.S.] at 56–57 [85 S.Ct. at 737–38] (failure to confine time within which censor must make decision "contains the same vice as a statute delegating excessive administrative discretion"). Thus, where a scheme creates a "[r]isk of delay," 380 U.S. at 55 [85 S.Ct. at 737], such that "every application of the statute create[s] an impermissible risk of suppression of ideas," *Taxpayers for Vincent*, [466 U.S.] at 798 n. 15 [104 S.Ct. at 2125 n. 15], we have permitted parties to bring facial challenges.

*FW/PBS*, 493 U.S. at 223–24, 110 S.Ct. at 603–04. What is puzzling is that although the Dallas ordinance on its face did not contain any of the *Freedman* limitations, *id.* at 227, 110 S.Ct. at 605–06, the only reasons advanced by the Court in allowing a facial challenge were those stated earlier: the Court found that the ordinance "largely targets businesses purveying sexually explicit speech which the city concedes ... are protected by the First Amendment," *id.* at 224, 110 S.Ct. at 604, and that "the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses." *Id.* at 225, 110 S.Ct. at 604. In holding that a facial challenge was

permitted, the Court felt it unnecessary to address whether the ordinance gave the decisionmaker unbridled discretion or contained inadequate procedural limitations. On this point the City of Dallas' admissions were fatal. In the present case, however, the City of Chicago concedes nothing; therefore, I will briefly address what I perceive as the Supreme Court's new slant (announced but not applied) on allowing facial challenges in the First Amendment arena.

Justice White, dissenting in *FW/PBS*, argues that *Freedman's* procedural safeguards were designed to "protect against arbitrary use of the discretion conferred by the ordinance." *Id.* at 246, 110 S.Ct. at 616. Justice O'Connor, however, sees the lack of procedural safeguards as "a species of unbridled discretion." *FW/PBS*, 493 U.S. at 223–24, 110 S.Ct. at 603–04. It is not clear exactly what Justice O'Connor means by this statement because the *FW/PBS* case sidestepped the issue of whether the lack of procedural safeguards allows a facial challenge, relying rather on the city's admissions. The key distinction between Justice White's and Justice O'Connor's approaches rests on a fundamental disagreement over facial verses as-applied challenges.

The Supreme Court continues to disfavor facial challenges. *FW/PBS*, 493 U.S. at 223, 110 S.Ct. at 603. Justice White, dissenting in *Lakewood*, objected to allowing a facial challenge where an ordinance granted discretion to a government official because it presumes that such discretion would be illegally exercised. *Id.*, 486 U.S. at 776, 108 S.Ct. at 2154. Rather than await whether a government official actually exercised his discretion unlawfully (an as-applied challenge), the Supreme Court would allow a facial challenge "whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759, 108 S.Ct. at 2145. It is one thing to conclude that censorship occurs where the government could use its power unlawfully under an ordinance involving unbridled discretion; it is quite another, as the court in this case holds, to conclude that a person would feel censored where the government's discretion is limited, yet that discretion is not subject to certain procedural safeguards.[6]

The Supreme Court has not addressed this point directly. Justice O'Connor's opinion that procedural safeguards are a "species" of unbridled discretion does not say that censorship is more likely to occur when there is a lack of procedural safeguards and yet the ordinance otherwise limits a decisionmaker's discretion. It is naive to think that a person lacks a judicial forum when their speech is allegedly infringed. Neither Graff nor the City of Chicago argues that the judiciary cannot hear challenges to this ordinance because

---

6. The court reads *Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325 (7th Cir.1991), as "merely regulat[ing] the size of newsracks; it did not exercise licensing power to deny permit applicants the means to conduct business related to the First Amendment." [page 1062 n. 5]. I disagree. In *Chicago Observer*, the City of Chicago enacted an ordinance "designed to get the Observer's billboards off the sidewalks," and addressed the size and advertisements concerning newsracks. 929 F.2d at 327. The district court enjoined the City from removing any newsracks because the owners were not given an opportunity for a hearing prior to removal. After the City amended the ordinance to provide for notice and a hearing, the district court refused to vacate the injunction on the grounds that the Commissioner had unfettered discretion to later revoke the amendment. *Id.* We reversed, upholding the ordinance because the City "offers hearings before a neutral arbiter, the right to be represented by counsel, to pres-

ent evidence, to cross-examine adverse witnesses." *Id.* at 328.

If the ordinance originally did not provide for notice and hearing procedures, it obviously did not provide the procedural safeguards articulated in *Freedman* or, as this court now asserts, in *FW/PBS*. We simply noted that The Chicago Observer did not seek review in state court. *Id.* at 327. And we did reach some of Chicago Observer's constitutional arguments, stating that "Chicago does not regulate the viewpoint of publications; it is concerned only with size and advertising." *Id.* The parties do not dispute that the ordinance in this case gives proper notice and an opportunity for a hearing. The court only complains that the Commissioner's ultimate decision is not limited by the *Freedman* standards. The court's holding in this case seems to condemn the ordinance we approved in *Chicago Observer*. This would be contrary to the court's assertion that the case is not relevant here.

of the lack of judicial permission in the ordinance. The lack of these procedural safeguards does not censor speech, where these procedural safeguards, in a practical sense, neither expand nor detract from our jurisdiction over constitutional questions. The Illinois state courts also maintain jurisdiction over the Commissioner's decision through the writ of common law certiorari. *See Stratton v. Wenona Community Unit Dist. No. 1*, 133 Ill.2d 413, 141 Ill.Dec. 453, 458, 551 N.E.2d 640, 645 (1990). *Lakewood* favored a facial attack because the lack of express standards would make judicial review, and the plaintiff's burden of proof, difficult on the question of whether the decisionmaker had disfavored certain speech, or was unconstitutionally motivated. *Id.*, 486 U.S. at 757–58, 108 S.Ct. at 2144–45. *Freedman* favored a facial attack because awaiting the censor's exercise of discretion and bringing an as-applied challenge to the ordinance "may be too little and too late." *Id.*, 380 U.S. at 57, 85 S.Ct. at 738. Such reasons for a facial attack concerning judicial review are not present in this case.[7]

The ordinance's express standards give adequate and specific guidance to the Commissioner, and predictable reasons to the applicant, as to why a particular permit to build a newsstand should be preferred. If a permit to build the newsstand were denied, these express standards give the plaintiff adequate guidance in challenging the application of the ordinance to his particular case, and upon judicial review allows an informed inquiry into whether the Commissioner made his decision in an unconstitutional manner, such as by disfavoring certain speech. If Graff were ultimately denied a permit under the ordinance, he could only feel censored by the application of the ordinance's criteria to his particular situation, not because the ordinance does not contain specific procedural safeguards. Such judicial review would also not come "too little and too late." Graff does not argue that the City of Chicago cannot ban newsstands entirely. And he cannot seriously argue that he has a constitutional right to erect a newsstand on public property anywhere he desires.

A facial challenge should not be permitted in the present case for either of two reasons. Newsstands involve the building of structures. Thus, the ordinance does not have "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Lakewood*, 486 U.S. at 759, 108 S.Ct. at 2145. In the alternative, the ordinance does not vest the Commissioner with unbridled discretion so as to censor Graff's speech. I would therefore dismiss Graff's complaint to the extent that it alleges only a facial challenge to the ordinance.[8]

### III. A Facial Challenge Should Be Remanded

In many ways this case resembles *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). There the city of Renton, Washington en-

---

**7.** In *FW/PBS*, a plurality (JJ. O'Connor, Stevens and Kennedy) applied only two of the three procedural safeguards in *Freedman* to a licensing scheme involving sexually oriented businesses. *Id.* 493 U.S. at 229–30, 110 S.Ct. at 606–07. Justices White, Scalia, and Chief Justice Rehnquist did not apply the *Freedman* safeguards. And Justices Brennan, Marshall and Blackmun would have applied all three of the *Freedman* safeguards. In the present case, by simply citing to *FW/PBS*, 493 U.S. at 228, 110 S.Ct. at 606, as authority for its holding, the court disregards the fact that Justice O'Connor at least considered the nature of the speech and the discretion in the ordinance as relevant inquiries regarding the extent the *Freedman* safeguards are necessary. If the full procedural protections of *Freedman* are not necessary in the context of sexually oriented licensing schemes, *FW/PBS*, 493 U.S. at 228, 110 S.Ct. at 606, what law demands that the *Freedman* safeguards are nec-

essary in an ordinance that regulates the building of newsstands on public property?

**8.** The importance of an as-applied challenge is particularly appropriate in this case. Graff has insisted on operating his newsstand on property protected by the Commission on Chicago Historical and Architectural Landmarks. After Graff's first amended complaint of September 11, 1991, and the district court's decision of May 28, 1992, the Landmark Commission denied Graff's application on August 13, 1992, concerning a permit to build a newsstand on property that is part of the Chicago Public Library Cultural Center. Graff does not challenge the Landmark Commission's actions as violative of the First Amendment. Thus, if Graff wishes to build his newsstand only where a permit is necessary from the Landmark Commission, he should have no standing to challenge any ordi-

acted a zoning ordinance to prohibit adult motion picture theaters from locating within a certain distance from residential, church, or school property. *Id.* at 43, 106 S.Ct. at 926. The Supreme Court found that the ordinance

> does not appear to fit neatly into either the "content-based" or the "content-neutral category." To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, as the district court concluded, the Renton ordinance is aimed not at the content of the films shown at "adult motion picture theatres," but rather at the secondary effects of such theaters on the surrounding community.

*Id.* at 47, 106 S.Ct. at 929. The Supreme Court analyzed the ordinance by looking at the time, place, and manner restrictions in the regulation. The Supreme Court held that the Renton ordinance was justified without reference to content, thus "content-neutral," *id.*, and served a substantial government interest, while allowing for reasonable alternatives of communication. *Id.* at 53–54, 106 S.Ct. at 932. If a city can restrict speech through the planning, regulation, and zoning of property because of the secondary effects of adult motion pictures on the neighborhood, *id.* at 51–52, 106 S.Ct. at 931, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976), the City of Chicago should be allowed to regulate newsstands, if for only aesthetic reasons. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984).

In light of the procedural posture of the present case, what the court holds today is unprecedented. Graff filed a complaint for damages and injunctive relief. Rather than conduct a preliminary hearing, the district court denied injunctive relief by granting the defendant's motion to dismiss two of three counts in the complaint. By reversing the district court and holding, as a matter of law, that the ordinance is invalid on its face, the defendants lose without having even answered the first amended complaint.

If the matter were indeed properly remanded, rather than reversed, we could direct the district court to wait until the summary judgment stage of the litigation to address the ultimate question of whether the ordinance should stand. In *FW/PBS*, 493 U.S. at 221, 110 S.Ct. at 602, *Renton*, 475 U.S. at 41, 106 S.Ct. at 925, *Vincent*, 466 U.S. at 792–93, 104 S.Ct. at 2122, and *Young*, 427 U.S. at 55, 96 S.Ct. at 2445, the cities were at least allowed to get to the summary judgment stage. The City of Chicago should at least be given the opportunity to show the substantial governmental interests at stake, the reasonableness of the ordinance's time, place, and manner restrictions, and the alternative avenues of communication available to Graff. Only after such an inquiry should we address the extent to which the *Freedman* safeguards are necessary. The court criticizes the district court for failing to "measure either the city's proposed interests in regulating expressive conduct or the availability of alternative channels of communication." [p. 1068]. Even if the district court had attempted to do so, ruling on a motion to dismiss is no place for such an inquiry. In this case, however, this court goes in the opposite direction and strikes down an ordinance on nothing more than the allegations in a complaint.

### IV. Conclusion

Graff filed his original complaint on February 20, 1991. The City of Chicago thereafter amended its newsstand ordinance on June 28, 1991. The City was searching for a reasonable alternative to either prohibiting newsstands entirely or permitting newsstands at will. Today's decision takes a microscope to the ordinance and concludes that newsstands, *per se*, involve speech, and that newsstand ordinances must have a one-sentence section that gives an unidentified court or other reviewing

---

nance that gives the Commissioner of Public Works the power to subsequently act on the permit. Neither the parties nor the district court addressed the matter in detail; I mention

it only to illustrate that a facial challenge to the ordinance Graff attacks may still not allow Graff to maintain his newsstand on Landmark property.

body power to review a Commissioner's decision. The extent to which this judicial review must comply with all of the *Freedman* safeguards we do not know. It could take the City of Chicago only one meeting to correct the technicality the court finds problematic. But the court does little in giving the City any clue to other possible weaknesses in the ordinance. The court holds "that a municipality must grant its citizens certain procedural safeguards where it seeks to license expressive activity." *Supra*, p. 1063. But the ordinance the court strikes down today purports to allow newsstands only when a permit is granted. Since the court "most emphatically reject[s] the notion that private parties have any unassailable right to build structures on public property," (*supra*, p. 1063), by what right does Graff operate his newsstand on public (Landmark) property? Without answers to these questions, the case will probably start over, giving the parties another two years of litigation expense before we hear it again. This type of strident, piecemeal review neither promotes the interests of the First Amendment nor the needs of the parties in resolving this case.

I respectfully dissent.

Before BAUER, Chief Judge, CUMMINGS, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ILANA D. ROVNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.*

### ORDER

April 15, 1993.

On consideration of the petition for rehearing with suggestion for rehearing *en banc* filed by defendant-appellee on March 16, 1993, and the answer of plaintiff-appellant, a vote of the active members of the Court was requested and a majority of the judges in active service have voted to rehear this case *en banc.*

IT IS ORDERED that rehearing *en banc* be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that the opinion entered in this case on February 16, 1993, be, and is hereby, VACATED. This

* Judge Fairchild was a member of the original panel.

case will be reheard *en banc* at the convenience of the Court.